# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2436-23
               A-2437-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

T.L. and R.M.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.O.M.,
a minor.

_____

      Argued December 11, 2024 – Decided January 31, 2025

      Before Judges Currier, Paganelli and Torregrossa-O'Connor.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FG-16-0026-24.

James D. O'Kelly, Designated Counsel, argued the cause for appellant T.L. in A-2436-23 (Jennifer Nicole Sellitti, Public Defender, attorney; James D. O'Kelly, on the briefs).

Rebekah E. Heilman, Designated Counsel, argued the cause for appellant R.M. in A-2437-23 (Jennifer Nicole Sellitti, Public Defender, attorney; Rebekah E. Heilman, on the briefs).

Wesley Hanna, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of counsel; Wesley Hanna, on the brief).

Jennifer M. Sullivan, Assistant Deputy Public Defender, argued the cause for minor (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, of counsel and on the brief).

PER CURIAM

In these appeals, calendared back-to-back and consolidated for purposes of this opinion, defendants T.L. (Tonya)[1] and R.M. (Ronald) appeal from the March 25, 2024 order terminating their parental rights to their son A.O.M. (Albert) following a one-day trial. The Division of Child Protection and

---

[1] We use pseudonyms to refer to the individuals in this case for the purposes of confidentiality and clarity. R. 1:38-3(d)(12).

Permanency (Division) and the Law Guardian, on behalf of Albert, argue for affirmance. We affirm.

I.

On appeal, Tonya preliminarily argues the trial judge's: (A) admission he had not reviewed the Division's evidence prior to rendering his opinion requires a reversal of the judgment and (B) permitting Araceli Batiz (Batiz), the Division's adoption caseworker and custodian of record, "to testify about conversations that a different caseworker had with the non-testifying resource parents" and permitting the admission of the Division's Adoption and Kinship Legal Guardianship Comparison Chart Acknowledgment Receipt (KLG fact sheet) with statements attributable to the non-testifying resource parents was an abuse of discretion. We consider Tonya's preliminary arguments before we consider her and Ronald's substantive arguments regarding the trial court's judgment.

A.

Tonya contends that the judge's comment that he "[h]onestly . . . ha[d]n't read through all the exhibits" amounted to a "nonchalant admission evinc[ing] a half-hearted interest in [his] solemn duty to determine if a parent's parental

3

rights should be permanently terminated based on the evidence submitted by" the Division.

Our review of the trial transcript reveals that the judge's comment was made in response to Tonya's attorney's assertion that information in certain exhibits that related to "reasonable efforts" for Ronald should not be attributed to Tonya. In stating he had not "read through all the exhibits," the judge noted he was "trying to understand what [the] argument [wa]s."

The Division argues that Tonya's "quotation of the court's statement is offered without context and, properly explained, does not support her contention." The Division explains that the judge did "not 'admit[] that [he] had not reviewed the evidence'" but instead "was simply expressing that [he] did not know which exhibits [Tonya] was referencing." Further, the Division contends "[t]he court's decision demonstrates that [he] was very familiar with the evidence and paid close attention to the testimony." Ultimately, the Division argues that Albert's "rights to safety and permanency cannot be undone by a single, inartfully-worded comment" in the face of the otherwise overwhelming evidence in the record.

The Law Guardian asserts that Tonya "provides no indication as to how the comment changed the outcome of the proceedings." The Law Guardian

argues "[e]ven if the trial court largely based its findings on the testimony of caseworker Batiz, which it observed and found to be credible, the documentary evidence conformed with the testimony, confirming the court's conclusions."

Lastly, the Law Guardian argues that Tonya overstates the importance of the comment because it "was not an indication that [the court] had not read any exhibits, did not understand the documentary evidence, or was not still reading exhibits throughout the remainder of the trial, after they had been admitted, and before it rendered its supportable decision."

We conclude the trial court's comment does not warrant reversal. While the statement that it had not "read through all the exhibits" causes some initial trepidation, especially considering the constitutional magnitude of the rights at stake, we are convinced that the comment falls well short of Tonya's asserted "nonchalant admission evinc[ing] a half-hearted interest." There is nothing from our review of the record that leads us to conclude that the trial court did not provide this matter with the attention and respect it required.

## B.

Tonya contends that "[t]he trial court['}]s evidentiary rulings that [the Division] could establish the resource parents' intention to adopt [Albert] through the testimony of a caseworker repeating the notes of a non-testifying

[Division] caseworker concerning her discussion with the non-testifying resource parents was a clear abuse of discretion that requires reversal . . . ."

Relying on our opinion in New Jersey Division of Child Protection and Permanency v. N.T., 445 N.J. Super. 478, 487 (App. Div. 2016), Tonya argues:

> whether the Division report is offered under N.J.R.E. 803(c)(6), N.J.S.A. 9:6-8.46(a)(3), Rule 5:12-4(d), or Cope,[2] statements in the report made by any other person are inadmissible hearsay, unless they qualify under another hearsay exception as required by N.J.R.E. 805.

Tonya contends that the trial court erred in four respects. First, although "conced[ing] that a KLG . . . fact[]sheet form would qualify as a D[ivision] record," and be admissible as an exception to the hearsay rule, Tonya asserts that N.T. precludes the resource parents' "alleged statements" on the form from being admitted, because the resource parents are not Division "staff personnel or professional consultants." Therefore, Tonya argues that absent another hearsay exception as required by N.J.R.E. 805 the resource parents' "alleged statements" on the form are inadmissible.

Second, Tonya argues that Batiz's testimony that "the prior adoption worker who initialed this document and signed it did discuss this with the

---

[2] In re Guardianship of Cope, 106 N.J. Super. 336 (App. Div. 1969).

A-2436-23

resource parent," was inadmissible because "pursuant to N.T., [the Division] cannot introduce the hearsay statements of resource parents . . . without a separate hearsay exception."

Third, Tonya argues that Batiz's testimony, "that the resource parents informed a non-testifying caseworker that the resource parents were 100% committed to adopting" Albert, was inadmissible pursuant to N.T. because "the resource parents do not qualify as D[ivision] staff personnel or professional consultants."[3]

Fourth, Tonya reiterates that any statement attributable to the resource parents on the KLG fact sheet should have been deemed inadmissible hearsay pursuant to N.T. Tonya argues "[t]his panel should hold that in guardianship cases, without the testimony of the resource parent, the assertions made through the resource parents' signatures on th[e KLG fact sheet] are objectionable hearsay."

The Division contends Tonya "never objected to the court's consideration" of "Batiz's testimony about [the resource parent]'s commitment, or even her

---

[3] Tonya's argument misconstrues Batiz's testimony. Batiz did not testify that the resource parents told a prior non-testifying caseworker that they were 100% committed to adoption. Instead, Batiz testified that she understood the resource parents were 100% committed. We detail the testimony later in this opinion.

signature on the . . . KLG . . . fact sheet, because it was hearsay."  Instead, the Division notes Ronald objected—although he has not raised it again on appeal—and, at the time, Tonya "agreed with the Division that [the testimony] was proper."  Therefore, the Division argues "having affirmatively agreed to its admission below, [Tonya cannot] claim it was error now," citing Brett v. Great American Recreation, 144 N.J. 479, 503 (1996).

In addition, the Division contends "resource parent testimony is not required to prove their commitment to adoption, leaving the question of appropriate proofs to the discretion of the trial court, except in cases where the resource parent vacillated on their preferred permanency option."

The Law Guardian argues that "[t]he trial court was correct that the documents in question themselves were admissible based on the exceptions to the hearsay rule," citing N.J.R.E. 803(c)(6) and Cope.  Moreover, "[t]he documents that establish that the Division communicated information to the resource parents about adoption and KLG, and Batiz's testimony that those conversations occurred, were all unquestionably admissible."

Therefore, the Law Guardian contends "[t]he only portion of the court's ruling that remains at issue is direct statements by the resource parents who did not testify."  The Law Guardian argues "the dangers of hearsay are decreased in

a bench trial because the [judge] can understand the limitations of that evidence," citing New Jersey Division of Child Protection and Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016), and "a hearsay error only mandates reversal where that error drove a different result," citing Neno v. Clinton, 167 N.J. 573, 586 (2001).

The Law Guardian contends "there is no question that adoption by his relative awaits [Albert] on the other side of the termination of [Tonya's] and [Ronald's] parental rights. There is no record of the resource parents' wavering in their plan to adopt him." Therefore, the argument follows, "[e]ven without the testimony and documentation of the resource parents' intention and desire to adopt [Albert], the four prongs of N.J.S.A. 30:4C-15.1(a) were satisfied."

We begin our analysis with the definition of hearsay. Under N.J.R.E. 801(c), hearsay "means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." A statement is "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." N.J.R.E. 801(a). Unless otherwise provided in the rules of evidence or other law, hearsay is not admissible. N.J.R.E. 802.

In Cope, we recognized "a rule requiring all [Division] personnel having contact with a particular case to give live testimony on all matters within their personal knowledge would cause an intolerable disruption in the operation of the" Division.  106 N.J. Super. at 343.  Therefore, we held "it becomes necessary to allow certain evidence to be produced in a hearsay form while seeking to give full protection to the rights of the parent."  Ibid.

Thus, we concluded that the Division was "permitted to submit into evidence, pursuant to Evidence Rules [803(c)(6) and 801(d)[4]], reports by [Division] staff personnel . . . prepared from their own first-hand knowledge of the case, at a time reasonabl[y] contemporaneous with the facts they relate, and in the usual course of their duties with the" Division.  Ibid.  We noted a "parent remains free to offer evidence contradicting any statements present in such reports."  Id. at 344.

Under Rule 5:12-4(d), the Division "shall be permitted to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants.  Conclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal."

---

[4]  In Cope, we cited N.J.R.E. 63(13) and 62(5), the predecessors to current N.J.R.E. 803 and 801 respectively.

Under N.J.R.E. 803(c)(6), "[t]he following statements are not excluded by the hearsay rule:"

> A statement contained in a writing or other record of acts, events, conditions, . . . made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.

However, as we explained in N.T., "even if a document 'is admissible as a record of regularly conducted activity,' statements by others reported by the author of the document 'are hearsay-within-hearsay,' each level of which . . . requires a separate basis for admission into evidence." 445 N.J. Super. at 497 (internal quotation marks omitted) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 375 n.1 (2010)). Thus "[a] 'hearsay statement[] embedded in Division records' from persons other than Division personnel and affiliated professional consultants 'may not be admitted unless it satisfies an exception to the hearsay rule.'" Ibid. (second alteration in the original) (quoting N.J. Div. of Child Prot. & Permanency v. B.O., 438 N.J. Super. 373, 385 (App. Div. 2014)). "The trial court must 'fully assess the evidential issues inherent in the Division's submission of documents which include statements by others than

Division workers.'" Ibid. (quoting N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 468 (App. Div. 2014)).

"[A] trial court's evidentiary rulings are 'entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment.'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Further, "[w]hen a party has brought an alleged error to the attention of the trial court . . . the error 'will not be grounds for reversal [on appeal] if it was harmless.'" Willner v. Vertical Reality Inc., 235 N.J. 65, 79 (2018) (internal quotation marks omitted) (quoting State v. J.R., 227 N.J. 393, 417 (2017)). Therefore, even if hearsay testimony is erroneously admitted, we will not reverse if the error was "harmless . . . in view of the other similar proofs before the" judge. State v. Soto, 340 N.J. Super. 47, 65 (App. Div. 2001) (quoting State v. Federico, 198 N.J. Super. 120, 131 (App. Div. 1984)). "An error cannot be harmless if there is 'some degree of possibility that [the error] led to an unjust

result.'"  Willner, 235 N.J. at 79 (quoting State v. Lazo, 209 N.J. 9, 26 (2012)) (alteration in original).

We consider Tonya's objections against these well-established principles. The hearsay objections center on Batiz's testimony regarding the prior caseworker's entry in Division records that they had a KLG versus adoption conversation with the resource parents and executed the KLG fact sheet.  In addition, Tonya objects to statements attributed to the resource parents' through Batiz's testimony—that the resource parents were 100% committed to adoption—and as contained on the KLG fact sheet.

We conclude there was no error in admitting Batiz's testimony regarding the prior caseworker's report of the KLG versus adoption conversation or the KLG fact sheet.  Our review of the trial transcript reveals the following exchange:

> [Division's attorney]:  So the prior adoption worker who initialed th[e KLG fact sheet] and signed it did discuss this with the resource parent?
>
> Batiz:  That is correct.
>
> [Ronald's Attorney]:  Objection.  She can't speak for the --
>
> The Court:  Well, I don't think that we need to bring the other worker in.  Do we, [Division's attorney]?  Now, what does the Division say?

[Division's attorney]: No, Your Honor. Again, under In re: Cope, there's no requirement that every Division worker who previously has been assigned to a matter has to be brought in to testify.

The Court: Was that part of the record that you certified to the worker, these discussions? It was referenced in the documents that - -

[Division attorney]: Yes, Judge.

The Court: It was. Okay. All right. Go ahead. Overruled. The objection is overruled.

Our review of the Division's record reveals the prior Division caseworker's record entry that "[t]he Division completed a KLG vs. [a]doption conversation with" the resource parents. Moreover, the Division's record contains the KLG fact sheet executed by the Division caseworker and the resource parents. Therefore, Batiz's testimony regarding the prior caseworker's report of the KLG conversation and the execution of the KLG fact sheet were properly admitted, as was the KLG fact sheet itself under N.T., Cope, Rule 5:12-4(d), and N.J.R.E. 803(c)(6).

Tonya next argues that the judge erred in admitting Batiz's hearsay testimony regarding the resource parents' level of commitment to adoption, citing to the following colloquy:

> [Division's attorney]: And since you've had the case, Ms. Batiz, have you had discussions with the [resource parents] regarding their level of commitment?
>
> Batiz: They are 100[%] committed.
>
> [Ronald's Attorney]: Same objection.
>
> The Court: Overruled.

Initially, we note that while the question suggests Batiz's response would contain hearsay, the response itself did not. Batiz's response did not include a statement made by the resource parents. Given this fleeting comment and the lack of any evidence disputing the resource parents' commitment to adoption, we are satisfied the trial court did not abuse its discretion in overruling the objection and permitting the testimony.

Lastly, we consider statements attributed to the resource parents in the KLG fact sheet. The fact sheet itself contains information comparing adoption and KLG. The only statement in the KLG fact sheet attributable to the resource parents is "I/We [resource parents' names] have received a copy of the Adoption and Kinship Legal Guardianship Comparison Chart. I/We have had a discussion with the Worker about adoption and kinship legal guardianship. We understand, if I/We have any additional questions, I/We can contact the Worker."

A-2436-23

Tonya argues that without the resource parents testifying, this statement is objectionable hearsay. In N.J. Div. of Child Prot. & Permanency v. M.M., we stated that "we do not require, per se, the testimony of [a] resource parent, [because] we appreciate that presenting such testimony and withstanding the rigors of cross-examination by defense counsel may be stressful for the resource parents and possibly disharmonious to the whole extended family." 459 N.J. Super. 246, 275 (App. Div. 2019).

However, we did "not resolve . . . whether it was appropriate for the trial court to admit or consider certain hearsay statements attributed to the resource parents about their views concerning adoption and KLG." Id. at 276. Instead, "[w]e suggest[ed] that a case management conference be conducted to address these evidential issues in limine in light of Rule 5:12-4(d) and case law excluding improper embedded hearsay statements by third parties." Ibid.

Here, the resource parents' statements in the KLG fact sheet that they—received the KLG form, discussed KLG and adoption with the caseworker, and understood they could contact the Division's caseworker if that had additional questions—are hearsay.

However, concluding that the resource parents' statements in the KLG fact sheet were hearsay does not complete our analysis. Instead, we must still

16

determine whether the admission of the hearsay was harmless. <u>Willner</u>, 235 N.J. at 79.

In this regard, we are satisfied that the admission of the resource parents' KLG fact sheet hearsay statements was harmless. The statements were redundant to other evidence in the record, Batiz's testimony and other Division records. The other evidence indisputably established that the Division caseworker provided the KLG fact sheet to the resource parents and discussed KLG and adoption with them. Considering these similar proofs, the admission of the KLG fact sheet statements did not lead to an unjust result.

## II.

We now turn to the merits of Tonya's and Ronald's appeal regarding the trial court's application of the best interests standard under N.J.S.A. 30:4C-15.1(a)(1) to (4).

## A.

At trial, the judge heard testimony from one witness, Batiz, and admitted thirty-four Division exhibits. In assessing Batiz's credibility, the trial judge considered her "demeanor" and "the objective reasonableness of her testimony." While noting Batiz referred to the reports to answer some questions, he found she provided "forthright answers" and did not "avoid questions."

## B.

We glean the facts from the trial record. Albert was born in May 2022. His natural parents are Tonya and Ronald. Albert was born with Down Syndrome.

The Division became involved with the family because it suspected that Albert was a "substance affected newborn." When a Division caseworker met with Tonya in the hospital, Tonya indicated she had used "crystal [m]eth." Tonya explained that she used the drug daily since July 2021. She also indicated that Ronald had used the drug—even before she met him—but they both stopped when they learned of her pregnancy.

Tonya indicated she wanted to start retaking her medications for her "depression, bipolar and anxiety." Tonya stated that she was homeless. She explained that she and Ronald had been staying with his mother, but "she kicked them out and they c[ould no]t stay there any longer." She indicated that she had some family support—a cousin in Hackettstown and an aunt in Elmwood Park— but they were "unable to take her in." In addition, Tonya stated that her: mother had a history of addiction and was living in Peru; "sister suffer[ed] from schizophrenia"; and "brother [wa]s also using drugs." Therefore, Tonya could not "really identify them as a support [for] her."

A-2436-23

At the caseworker's suggestion, Tonya expressed an interest "in going into a mommy and me program where she would be able to address her drug use and also have stable housing and receive all the services needed." The caseworker advised they would investigate a mommy and me opening for Tonya.

The caseworker inquired about any domestic violence issues involving Ronald, and Tonya "denied" any concerns or that Ronald "was abusive towards her in any[ ]way."

The caseworker also met with Ronald. Ronald advised that he encouraged Tonya to go into a program because it was "best" for her and Albert. He denied current drug use and stated he "stopped using once he found out that [Tonya] was pregnant." Ronald said he had used "crystal meth and smok[ed] [m]arijuana." Further, he stated "he plan[ned] on trying to obtain an apartment and getting a job." He indicated that he would come to the Division office the next day for a substance abuse evaluation. Batiz testified that Ronald did not appear at the office the next day.

Ronald stated that he wanted to be "linked to some parenting educational classes," and the caseworker advised that referrals were made for he and Tonya to go "to the [p]aternal partnership."

With the Division's help, Tonya secured a spot in a mommy and me program. She completed her intake appointment, including a drug "screen [which] was negative for all illicit substances," but, left the program the next day. The Division caseworker spoke with Tonya and she returned to the program. However, in the early hours of the next day, Ronald arrived at the program and Tonya left again.

A week later, Tonya emailed the Division caseworker. Tonya stated she made a "mistake" and "regrett[ed]" leaving the program. She indicated that Ronald "did not want her there anymore and he did not like" the program. Although noting that Ronald could "be controlling at times . . . [she again] denied any domestic violence."

The Division unsuccessfully attempted to get Tonya re-enrolled into the mommy and me program, but was able to get Tonya into another program. When Albert was discharged from the hospital, Tonya picked him up and brought him to the program where they were to reside together.

Thereafter, the program reported that Tonya "tested positive for [a]mphetamines." Tonya admitted that she relapsed because she had a stopped taking her medications and experienced a "panic attack." She explained she was "unable to control her emotions without her medications."

In June 2022, Albert was readmitted to the hospital because of weight loss and signs of dehydration. The Division visited Tonya's program and was advised that Tonya left the program.

The Division spoke with Ronald's mother, who said she "was unable to take [Albert] . . . into her home." Tonya's cousin from Pennsylvania indicated she "was interested in being explored as a potential placement" for Albert and she provided the Division with all of her information.

The Division caseworker was able to speak with Tonya and Ronald during a visit with Albert in the hospital. Tonya advised that she left the mommy and me program because "she did not like" the program and "it felt like a [j]ail." Tonya indicated that she did not have another plan for Albert. She declined "to complete a drug assessment" because she was "not using at th[e] time."

Ronald had not complied with the Division's "numerous" requests to go to the Division's office and "complete a drug screen." He advised the Division that he was working on a plan for Albert but did "not wish to share it with the worker." Nevertheless, he explained that "he plan[ned] on getting [himself and Tonya] . . . job[s] and a place to live within the next week or so." Ronald "refused to complete a drug screen at the hospital."

The Division advised Tonya and Ronald that it was effectuating an emergency removal of Albert because Tonya and Ronald were "unable to make a stable housing plan and ha[d] not been compliant with the Division." The Division effectuated a Dodd removal of Albert.[5]

On June 16, 2022, the Division was granted "custody and care and supervision" over Albert. Tonya and Ronald were "ordered to comply with the Division." Albert was placed with a non-relative resource.

The Division assessed and ruled out other potential placements for Albert. The Division was unable to assess Albert's paternal grandfather for placement because, "despite the worker asking several times" for contact information, Ronald never provided the information. In addition, the Division was reviewing Tonya's relative in Pennsylvania for Albert's placement.

The court held multiple case management conferences. Following each conference, the court entered orders requiring Tonya and Ronald to comply with the Division, submit to "substance abuse evaluation/treatment," and visit with Albert. On a number of occasions, the Division scheduled Tonya and Ronald for "substance abuse treatment and random urine screenings." The Division and

---

[5] A "Dodd" removal refers to the emergency removal of a child from a home without a court order, pursuant to The Dodd Act. N.J.S.A. 9:6-8.21 to -8.82.

the substance abuse treatment provider sent notices of the scheduled appointments via regular and certified mail and email. Tonya and Ronald failed to attend any appointments.

In addition, the Division scheduled court-ordered visitation to be held at its offices. Thereafter, the Division scheduled visitation at the O'Neill Center. Tonya and Ronald were advised, via regular and certified mail and email, about the visitation arrangements. The O'Neill Center reported that Tonya and Ronald had "poor attendance" and were "consistently late." Tonya and Ronald blamed their tardiness on "having to walk or ride their bikes to visits" despite having been provided bus passes for transportation. They explained that they "misplac[ed] the bus passes."

The O'Neill Center expressed concern that "[g]iven the inconsistency of visit attendance" the level of parent child attachment that was forming was "unclear."

In September 2022, the Division caseworker emailed Tonya and Ronald information regarding housing. The caseworker provided "a fl[y]er to both clients for INCCA Carrol Street Houses which [wa]s accepting applications for [one to four] bedroom apartments."

In February 2023, Tonya suffered a miscarriage. As relevant to this matter, Tonya "admitted [to the Division caseworker] that she had been using." The caseworker provided Tonya "with a list of service[] providers to get assistance for substance abuse and mental health." Tonya stated that the miscarriage was an "eye opener for her" and "she was going to engage with the Division and services."

In an April 2023 visit to the O'Neill Center, Tonya was provided with the names of "several places locally . . . that were hiring on the spot." She also mentioned her cousin who lived in Pennsylvania and that she would "be able to see" Albert. However, she also stated that the family would not allow Ronald to visit because the "family d[id] not like him."

At this visit, the Division caseworker requested that Ronald provide a "copy of [his] pay stubs to prove employment." However, Ronald responded that he did not want "[any]more questions." Then Ronald called the Division caseworker a "n****r"; a "dirty ass n****r"; spit at the Division caseworker; "postur[ed] as if he wanted to punch" the caseworker; stated he "want[ed] to punch [her] in [her] f*****g face n****r"; and threatened to slice her tires and find her and her family and "all you n*****s will be dead." As a result of his

"aggressive behavior," the O'Neill Center discharged Ronald from further in-person visitation at its facility.

Also, in April 2023, "[t]he Division completed a KLG vs [a]doption conversation with" the Pennsylvania resource family.

In May 2023, during a visit between Tonya and Albert, the Division caseworker "offered [Tonya domestic violence] services [however] she stated it was not needed." Albert was placed with the Pennsylvania resource family.

In June 2023, the Division's plan for the family changed from reunification to terminating Tonya and Ronald's parental rights to Albert. In the permanency order, the court found Tonya and Ronald "had been missing to the Division and contact was only recently made with both parties" and Tonya and Ronald "had been refusing to participate in substance abuse treatment." The court found the Division had "provided reasonable efforts to finalize the permanent plan, . . . reunification" including "substance abuse assessments, substance abuse treatment, urine screens, visitation, [and] relative exploration."

Also, the Division caseworker conducted a monthly visit with Albert in the resource parents' home. The caseworker noted Albert was "thriving and excelling well at this time."

The caseworker spoke with Ronald asking "if he was willing to comply with the court ordered substance abuse assessment, treatment and urine[ testing] and he declined.  He denied having a substance abuse problem . . . [or] needing to do this."

In July 2023, the Division caseworker conducted a monthly visit with Albert in the resource parent's home.  The caseworker noted there were "no concerns with [Albert] as the resource parents [we]re addressing all of [Albert]'s needs both physically and mentally."  The resource parents and the Division caseworker executed the KLG fact sheet.

When the permanency plan changed, the matter was assigned to Batiz.  The Division filed a guardianship complaint against Tonya and Ronald seeking to terminate their parental rights to Albert.  In a September 2023 email, Tonya advised Batiz that she was "going to do an inpatient treatment program for drug addiction, as well as for [her] mental health."  Also, Batiz visited Albert in the resource home.  She noted that Albert was "well cared for" and "appeared to bond well with" the resource parents.

The court held multiple hearings.  In the orders executed following these hearings, the judge ordered Tonya and Ronald to:  attend psychological/bonding evaluations; "attend inpatient/outpatient substance abuse treatment"; "submit to

random urine screens"; "avail themselves to the Division on a weekly basis"; and "provide updated addresses to the Division."

In October 2023, Batiz met with Tonya and Ronald in Division offices. During the meeting Batiz requested that they "comply with a random urine screen, as this was ordered by the court." However, Ronald "declined, stating that he was 'uncomfortable'" and Tonya "declined, saying that she needed to consult with her attorney first."

In December 2023, Tonya emailed Batiz. She indicated that Ronald told her that Batiz was trying the reach them and "completely apologize[d] for [her] lack of communication." Also, in December, Batiz visited with Albert at the resource home. She again reported that Albert was "well cared for, was awake and alert, and his interaction[s] with his resource parents w[ere] warm. [Albert] appeared to be bonded with all household members."

In January 2024, Batiz contacted her Pennsylvania counterpart and was advised that Albert was "doing well; he [wa]s meeting his milestones, and she reported having no concerns for" Albert.

In early 2024, Batiz sent various emails to Tonya and Ronald. In the emails, she reminded Tonya and Ronald of their missed substance abuse evaluations, and rescheduled same; their missed psychological evaluation with

27

the Division's psychologist and rescheduled same; and provided employment links and Down Syndrome group support information.

Batiz testified that Albert was "doing great" with the resource parents and the resource parents were "a loving family."

C.

In an oral opinion, the trial judge made factual findings and applied the correct standard of proof to the statutory prongs under N.J.S.A. 30:4C-15.1(a)(1) to (4). He first concluded that that the Division presented "overwhelming" evidence and established clearly and convincingly that Albert's "safety, health, or development has been or will continue to be endangered by the parental relationship."[6]

The judge considered that Albert was a special needs child and stated that the parent's lack of cooperation, care, and participation in Albert's life endangered him. The judge noted, at the time of trial, Albert was approximately two years old but had only lived with Tonya for two days. The judge stated that Tonya and Ronald had no plan to care for Albert. The judge credited Tonya and Ronald with attending some visits with Albert earlier in the case, but noted visits

---

[6] N.J.S.A. 30:4C-15.1(a)(1).

had not happened lately and there was no participation with court-ordered services.

The judge considered the second prong, whether Tonya or Ronald were "unwilling or unable to eliminate the harm facing the child, or [were] unable or unwilling to provide a safe and stable home for the child, and the delay of permanent placement w[ould] add to the harm."[7] The judge noted prongs one and two were related and he drew on his findings under the first prong to support his finding that the Division clearly and convincingly established prong two. He found Tonya's and Ronald's lack of participation in court-ordered services established an unwillingness and inability to eliminate the harm posed to Albert. The judge noted the concerns with Tonya's and Ronald's substance abuse and found that they failed to provide urine screens or attend substance evaluations.

Moreover, the judge found the Division made efforts to help Tonya and Ronald "locate housing." He noted the Division referred Tonya to two housing programs and provided housing information to both of them. Despite the Division's efforts, Tonya and Ronald were unable or unwilling to provide a safe and stable home for Albert.

---

[7] N.J.S.A. 30:4C-15.1(a)(2).

In addition, the judge considered whether delaying permanency for Albert would add to his harm. In this respect, the judge noted that the parties were in litigation for almost two years and Albert needed permanency. The judge stated "unfortunately, there[ i]s no likelihood that these parents in the near future will be in a position to care for this child because they just have[ no]t shown it." Thus, the judge concluded that delaying Albert's permanent placement would add to that harm.

The judge considered, under prong three,[8] whether the Division made reasonable efforts to provide services to help Tonya and Ronald "correct the circumstances which led to the child's placement outside the home" and if there were alternatives to terminating Tonya and Ronald's rights to Albert.

As to the Division's reasonable efforts, the judge detailed that the Division offered Tonya and Ronald: substance abuse assessments; urine screens; housing information; family team meetings; assessed relatives for placement; made a relative placement; visitation; bus passes; information regarding Down Syndrome support groups; and provided employment information and information for social services. The judge noted that Tonya and Ronald did not

---

[8] N.J.S.A. 30:4C-15.1(a)(3).

cooperate. The judge concluded the Division provided services to help Tonya and Ronald correct the circumstances that led to Albert's placement.

The judge also stated that he considered alternatives to the termination of Tonya and Ronald's parental rights to Albert. The judge noted that he considered KLG as opposed to terminating Tonya and Ronald's parental rights to Albert. However, he found the caseworker's testimony, and the resource parent's execution of the KLG fact sheet clearly established that KLG was not an alternative.

The judge also considered, under prong four, whether terminating Tonya's and Ronald's parental rights to Albert would "not do more harm than good."[9] Again, the judge drew on his findings under the other prongs. The judge stated that Tonya and Ronald had not cooperated with services and Albert needed permanency and was doing well in the resource home. Thus, the judge concluded, by clear and convincing evidence, that the Division satisfied the fourth prong.

### III.

On appeal, Tonya argues the judgment must be reversed as to her because the Division failed to establish N.J.S.A. 30:4C-15.1(a)(2) to (4) and Ronald

---

[9] N.J.S.A. 30:4C-15.1(a)(4).

argues the judgment must be reversed as to him because the judge's findings under all the prongs of N.J.S.A. 30:4C-15.1(a) were not supported by substantial credible evidence.

"Parents have a constitutionally protected right to maintain a relationship with their children." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007). That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447 (2012). "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

"The statutory best-interests-of-the-child standard [N.J.S.A. 30:4C-15.1(a)(1) to (4)] aims to achieve the appropriate balance between parental rights and the State's parens patriae responsibility." M.M., 189 N.J. at 280. The Division must prove each prong by "clear and convincing evidence." N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 115 (App. Div. 2021). These "four prongs are not discrete and separate;" they overlap to inform

a more general inquiry that the termination of parental rights is in a child's best interests. N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 145 (2018).

"Our review of a trial judge's decision to terminate parental rights is limited." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). "[I]n reviewing the factual findings and conclusions of a trial judge, we are obliged to accord deference to the trial court's credibility determination and the judge's 'feel of the case' based upon his or her opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 89 (App. Div. 2006) (quoting Cesare v. Cesare, 154 N.J. 394, 411-13 (1998)).

Further, "[a]ppellate courts should accord deference to family court factfinding in recognition of the family courts' special jurisdiction and expertise in family matters." N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 518 (App. Div. 2018) (internal quotation marks omitted) (quoting N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 365 (2017)). Thus, the judge's findings of fact are not disturbed unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

"[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

"A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Under N.J.S.A. 30:4C-15.1(a), "[t]he [D]ivision shall initiate a petition to terminate parental rights on the grounds of the 'best interests of the child' . . . if the following standards are met:"

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

Under prong one, the standard is whether "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship."  N.J.S.A. 30:4C-15.1(a)(1).

Tonya does not offer an argument under N.J.S.A. 30:4C-15.1(a)(1). Therefore, Tonya has waived any argument under prong one.  See N.J. Dep't of Envt'l Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 ("An issue that is not briefed is deemed waived upon appeal.").

Ronald contends that Albert was not endangered by his substance abuse or failure to comply with Division substance abuse services.  Although he admits he "disclosed past drug use," he argues that he "denied current drug use" and the Division "never received any positive urine screens or 'evidence' [he] was using drugs."  Moreover, he asserts that "[p]arents with addictions care for . . . children while attending various levels of treatment and an active addi[c]tion alone would not allow for . . . removal . . . unless the addiction was such that [the] child was endangered by the parent's substance abuse."  Ronald states that "for the sake of argument [if he does] have an active substance abuse issue, he could undergo detoxification if necessary and attend treatment while caring for his son."

A-2436-23

In assessing whether the child has been harmed by the parental relationship, "a parent or guardian's past conduct can be relevant and admissible in determining risk of harm to the child." N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 573 (App. Div. 2010).

Ronald acknowledges a history of drug use. He admitted to the Division that his drug use continued at least until he and Tonya found out she was pregnant with Albert. Given that history, the Division sought and the trial court ordered that he undergo drug screens and substance abuse assessments. Nonetheless, at every opportunity, Ronald refused to comply. Indeed, his assertion that the Division has no positive screens is not surprising considering his failure to submit to the screens. Ronald's history and incalcitrant behavior supports the conclusion that Albert's "safety, health, or development has been or will continue to be endangered by" Ronald's substance abuse. N.J.S.A. 30:4C-15.1(a)(1).

Ronald's arguments that parents with addictions can care for their children and he could undergo detoxification are of no moment, because he has not planned to care for Albert or submitted to the offered services to undergo an assessment, treatment, or detoxification.

Ronald's contentions that his poverty and homelessness cannot be used as a basis to determine he endangered Albert is misplaced. Ronald endangered Albert because he failed to address his substance abuse issues, plan for Albert, or participate in Albert's life. "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999).

The trial judge's factual findings are sufficiently supported in the record. We find no error in the application of N.J.S.A. 30:4C-15.1(a)(1), or the conclusion that the Division satisfied prong one, as to both Tonya and Ronald, by clear and convincing evidence.

## Prong Two

Under prong two the standard is whether "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2).

Tonya argues, "the case record lacks any allegations establishing that [she] suffered from a drug addiction or that she required services for addiction," the Division "did not make meaningful efforts to arrange services for" her, and

"the testimony concerning [the Division]'s efforts assisting [her] with securing housing [wa]s vague and unpersuasive." These arguments lack merit.

First, Tonya admitted to daily drug use before learning of her pregnancy with Albert, tested positive for amphetamines at the second mommy and me program, and admitted using drugs before her miscarriage. Therefore, the record supports a finding that her substance abuse posed a harm to Albert.

In response to Tonya's history, the court ordered her to undergo drug screens and assessments. She failed to comply with all scheduled appointments and refused to comply during the various times she was offered screens while in the presence of Division caseworkers.

Further, she was aware of her obligation to submit to screens and assessments. She was aware of the location of Division offices and had contact information for the Division's caseworkers. At any point she could have engaged the Division for the services. Thus, the trial judge's factual finding that Tonya was unwilling or unable to eliminate her substance abuse issue was sufficiently supported in the record.

Moreover, Tonya's contention that Batiz's testimony, as to the Division's efforts to assist her with housing, was vague and unpersuasive is misplaced. The trial judge found Batiz's testimony credible and there is no reason to disturb that

38                                                          A-2436-23

finding. Moreover, the Division's efforts resulted in Tonya being placed in two residential mommy and me programs with Albert. Tonya decided to leave those programs. Thereafter, the Division made housing information available. Thus, the trial court's finding that Tonya was "unable or unwilling to provide a safe and stable home for" Albert was supported in the record. N.J.S.A. 30:4C-15.1(a)(2).

Ronald contends his "perceived unwillingness to eliminate his alleged substance abuse [wa]s based on his non-attendance at substance abuse assessments." He argues that the Division failed to "effectively engage" him, blaming the Division's "unpredictable and reliable" notification methods for his failures. He also argues that he was not "unwilling to find housing." We conclude these arguments are unavailing.

Ronald's attempt to blame the Division's notification efforts for his failure to comply with court-ordered drugs screens and assessments is belied by the record. Ronald was aware of his obligation to submit to screens and assessments. He also was aware of the location of Division offices and had contact information for the Division's caseworkers. At any point he could have engaged the Division, responded to the Division's multiple efforts to contact him, and arranged for a screen or assessment.

Moreover, the record reflects various occasions when a Division caseworker was with Ronald and offered to conduct a drug screen immediately and Ronald declined. Therefore, the trial judge's factual finding that Ronald was unwilling or unable to eliminate his substance abuse issue was sufficiently supported in the record.

As to housing, the record is clear that Ronald was "unable or unwilling to provide a safe and stable home for" Albert. N.J.S.A. 30:4C-15.1(a)(2). Even giving Ronald credit for being willing to find housing, there is no dispute that he was unable to do so.

In their arguments under prong two, neither Tonya nor Ronald address the trial court's finding that a "delay of permanent placement will add to the harm" to Albert. N.J.S.A. 30:4C-15.1(a)(2). The trial judge noted that the matter had been in litigation for nearly two years, Albert needed a permanent place, and there was no evidence Tonya or Ronald could care for Albert. Thus, the judge concluded that delaying Albert's permanent placement would add to that harm. The judge's permanency finding is sufficiently supported in the record.

We conclude there was no error in the judge's application of prong two or his conclusion that the Division established the prong as to Tonya and Ronald through clear and convincing evidence.

<u>Prong Three</u>

Under prong three the standard is whether "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

A.

"'Reasonable efforts' mean attempts by an agency authorized by the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure, including, but not limited to:"

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

Under the third prong, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by their success." D.M.H., 161 N.J. at 393. Instead, the "efforts must be assessed against the standard of adequacy in light of all of the circumstances in a given case." Ibid. "Whether particular services are necessary in order to comply with the diligent efforts requirement must therefore be decided with reference to the circumstances of the individual case before the court, including the parent's active participation in the reunification effort." Id. at 390.

Tonya acknowledges that the Division's assertion "that it made reasonable efforts" to assist her "has surface appeal" but contends the argument "cannot withstand scrutiny." She argues that it is "literally impossible for a parent to complete enrollment into a service if they have not received actual notice that the referral had been scheduled" and "[t]here is simply no persuasive evidence suggesting [she] was receiving [the Division]'s correspondence about service referrals"; the Division's "failure to arrange appropriate visitation between [her and Albert wa]s just as problematic"; and "there was willful ignorance by [the Division] and a significant oversight by the trial court with respect to [her] allegations of domestic violence at the outset of the case." We conclude these arguments have no merit.

A-2436-23

Tonya's argument that she did not comply with substance abuse screens or assessments because she did not receive notice of the Division's and provider's referrals is belied by the record. The Division worked with the addresses and contact information it collected. In addition, at times, Tonya interfaced with the Division caseworker and was certainly aware of the location of the Division offices. Moreover, she was court ordered to make herself available to the Division and provide her address. Under these circumstances, Tonya was required to actively participate and failed to do so. Further, Tonya fails to explain the numerous times she declined the Division caseworker's request to have her submit to a drug screen when they were together.

In addition, Tonya's contention that the Division's visitation plan was inappropriate is not supported in the record. Tonya's in-person attendance at the O'Neill Center was poor and she was constantly late. Her attempt to blame her failure to visit or her late arrivals on her need to use her bicycle is countered by the Division's provision of bus tickets for her transportation. Moreover, after the Division effectuated placement with Tonya's relative, the Division offered virtual visitation and Tonya failed to participate.

Tonya's contention that she made "allegations of domestic violence at the outset of the case" is contradicted by the record. In her brief, she directs us to a

trial exhibit. As it relates to domestic violence, the referenced trial exhibit provides:

> [Tonya] stated [Ronald] can be controlling at times <u>but denied any domestic violence.</u> Worker and supervisor both advised [Tonya] power and control is domestic violence. Worker asked [Tonya] if [Ronald] controls who she speaks to and what she does and [Tonya] indicated he does not like her family and does not like when she speaks to them and also she has some friends wh[o] he does not like and does not like her to speak with them. [Tonya] was asked if there [are] any other issues and [she] denied such.
>
> [(Emphasis added).]

Therefore, in Tonya's referenced trial exhibit she actually denied domestic violence. Further, the record contains other incidents where Tonya denied domestic violence and even when the Division suggested referring her for domestic violence services, "she stated it was not needed."

Ronald contends "[t]he courts . . . finding that [the Division] facilitated appropriate visitation and that [he] . . . did not participate in visitation [was] not supported by the substantial credible evidence." He asserts he "attended almost fifty visits" although he also acknowledges his "tardiness and absence" from visits. He argues the Division "did not provide an alternative visitation supervisor when the O'Neill Center barred [him] from visitation." Further, he

contends the Division "did not provide in-person or virtual visitation . . . after [Albert]'s relocation to Pennsylvania."

However, the trial judge found that Batiz's testimony was credible. She testified that after Albert was placed in Pennsylvania the Division arranged for virtual visitation. Batiz stated that the O'Neill Center was willing to have Ronald participate in virtual visitation through the center, but he failed to participate. We find no reason to disturb the trial court's credibility determination or its factual finding that the Division provided visitation opportunities to Ronald.

The trial court's factual finding that the Division provided reasonable efforts to Tonya and Ronald is supported in the record. We conclude there was no error in the judge's determination that the Division established the first part of prong three clearly and convincingly as to Tonya and Ronald.

## B.

Under the second part of prong three, the trial court is required to "consider alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3).

Tonya argues the trial court failed to "meaningfully consider . . . KLG" or "engage in the requisite alternatives to termination analysis." She contends "[t]he trial court's decision to not consider and resolve whether a KLG placement

45

with [the resource parent] was in [Albert]'s best interests [wa]s diametrically opposed to the . . . child welfare law."  Tonya asserts the "trial court[] rel[ied] on . . . rank hearsay . . . [and] concluded that the resource parents had chosen adoption over KLG."

Ronald contends the trial court erred in failing to consider a KLG placement for Albert.  He states that "parental rights cannot be terminated when they can be preserved by KLG."  Moreover, he asserts the trial court's conclusion "erroneously and wrongfully gave away the court's parens patriae power to determine the post-trial permanency plan in [Albert]'s best interests to [the resource parents] by granting them veto power over KLG in favor of termination of [Tonya's] and R[onald]'s parental rights to serve their own desires and interests."

We are satisfied the resource parents understood the difference between the two permanency plans and there is no evidence the resource parents were not committed to adoption or wanted KLG.  Therefore, on these facts, we find no error in the trial court's consideration and rejection of KLG as alternative to termination.

## Prong Four

Under Prong Four the standard is whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). "[T]he fourth prong . . . is a 'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." F.M., 211 N.J. at 453.

Ordinarily, "to satisfy the fourth prong, the [Division] should offer testimony of a well qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." M.M., 189 N.J. at 281 (quoting In re Guardianship of J.C., 129 N.J. 1, 19 (1992)). Under this prong, an important consideration is "[a] child's need for permanency." Ibid. Ultimately, "a child has a right to live in a stable, nurturing environment and to have the psychological security that his [or her] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453.

Tonya argues that "[t]he trial court's quick resolution of prong four lack[ed] any meaningful application of the facts of the case to the controlling law" and "[o]ther than hearsay testimony, the trial court received no meaningful information about [Albert]'s resource parent[s]."

Ronald contends "no evidence was offered to prove that [Albert] would be better off with his" resource parents. He notes "[n]o bonding evaluations were completed and no documentary or testimonial evidence from a bonding expert was presented at trial." Ronald cites our opinion in A.R. for the proposition that there are "very few scenarios in which comparative evaluations would not be required." N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 440 (App. Div. 2009).

We reject Tonya's and Ronald's contentions that there was no meaningful information about the resource parents or a lack of evidence that Albert would be better off with the resource parents. The Division record and Batiz's testimony reflects that Albert was in a loving environment and doing well with the resource parents. Comparatively, Tonya and Ronald have not addressed their substance abuse issues and offer no plan to care for Albert.

Moreover, we find no merit in Ronald's argument that this matter required comparative bonding evaluations. We note that neither Tonya nor Ronald participated in the psychological and bonding evaluations that were court ordered and scheduled for them. In addition, the trial court found that Albert and Tonya only resided together for two days, and we note Albert and Ronald never resided together. Aside from not residing together, we note Tonya's and

Ronald's failure to comply with visitation. Under these circumstances we conclude that Ronald's argument that the fourth prong cannot be established without expert evaluations or testimony is unsupportable.

Therefore, we are satisfied the trial court's factual findings were adequately supported in the record and find no error in the court's conclusion clearly and convincingly that terminating Tonya's and Ronald's rights to Albert would not do more harm than good.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2436-23