JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.
**69 *1014 In this products liability case, we review both a trial judge's jury instruction related to evidence of a defendant manufacturer's conduct and our rule governing offers of judgment in cases in which a single plaintiff pursues joint and several liability against multiple defendants.
Plaintiff Josh Willner was injured while climbing a rock wall owned by his employer, Ivy League Day Camp (Ivy League). Willner sued the camp and the manufacturers of the wall and parts contained in the wall, Vertical Reality, Inc. (Vertical Reality), and ASCO Numatics (Numatics), respectively, alleging strict products liability claims and negligence. Before trial, Willner made a single offer of judgment to the defendants in accordance with Rule 4:58 in the amount of $125,000. No defendant accepted the offer or counteroffered.
By the end of the ensuing trial, the only count remaining against Numatics alleged a manufacturing defect. Because a defendant's conduct is not relevant to adjudicating such a claim, at the conclusion of the parties' cases, Numatics requested a jury instruction that advised the jurors not to consider evidence of its conduct or negligence. The judge denied the request and instead provided an instruction tracking the model jury charge for manufacturing defect claims.
The jury returned a verdict in favor of Willner, awarding him $358,000 and apportioning Numatics thirty percent of the liability and Vertical Reality seventy percent. The judge then granted Willner's motion for attorney fees and costs pursuant to the offer of judgement rule, Rule 4:58.
**70 Numatics appealed, and the Appellate Division affirmed. The panel found that the trial judge's jury instruction did not constitute plain error because he correctly advised the jury on the only evidence relevant to the manufacturing defect claim. The panel further held the judge's award of attorney fees and costs was proper because the jury's verdict was sufficiently greater than Willner's offer to trigger sanctions pursuant to Rule 4:58.
We affirm the panel's approval of the judge's jury instruction, albeit under a different standard of review, finding that the judge's actions were harmless error. We disagree with the panel, and reverse the imposition of sanctions on Numatics under the offer of judgment rule. It would be unfair to impose sanctions in a case where the only means for a party to avoid sanctions would be to pay an amount greater than the jury's verdict against that party, without advance notice of that consequence.
I.
A.
In the summer of 2006, Willner was employed as a junior counselor at Ivy League in Manalapan. The camp offered a rock climbing wall for its campers to use. The wall was manufactured by Vertical Reality and contained parts produced by Numatics. Willner's only responsibility in his role as junior counselor with regard to the rock wall was to assist campers as they put on harnesses and helmets; the camp employed specialists to assist with climbing.
On July 19, 2006, Willner was supervising a group of campers at the rock wall.
*1015 After his group finished, he was invited by a specialist to climb as well. He strapped on a harness and helmet. His harness was inspected by the specialist, and attached by a rope to an auto-belay system that was assembled by Vertical Reality and contained parts manufactured by Numatics.
Willner ascended approximately fifteen feet up the wall before deciding to come down. When he pushed off the wall to descend, **71 the rope initially supported his weight, but suddenly and rapidly lost all of its tension after he heard a loud noise. Willner fell to the ground, fracturing his ankle.
B.
Willner, who was sixteen at the time of the incident, and his parents filed a complaint against Ivy League, Vertical Reality, and Numatics, alleging strict products liability, negligence, and per quod claims. After a period of discovery, Ivy League was granted summary judgment and dismissed from the case.
The remaining parties entered settlement negotiations and Willner made an offer of judgment to the defendants in the amount of $125,000, which he filed pursuant to Rule 4:58. Neither party responded to Willner's offer.
The claims against Vertical Reality and Numatics proceeded to a jury trial. Willner's strict liability claims against defendants were based on theories of design defect, manufacturing defect, and failure to warn.
At trial, Willner presented an expert in safety engineering, who testified that Vertical Reality's design of the auto-belay system was inadequate for use on Ivy League's rock wall. According to the expert, the system should have supported the weight of a 250-pound person -- Willner's approximate weight at the time of his accident. The expert testified that the cylinders specified in the designs of the auto-belay system supported 250 pounds per square inch. The expert further testified that, because the fall of a 250-pound person would create far more force than 250 pounds per square inch, the auto-belay system was inadequately designed.
Willner's expert also opined that Numatics' cylinders were defectively manufactured, containing "void"-filled retainers. Numatics produced an expert who testified that, despite the voids found in the cylinders' retainers, the retainers were "manufactured in a manner that was reasonably fit, suitable, and safe for **72 [their] ordinary and reasonably foreseeable purposes on [a] 250 PSI rated cylinder."
Throughout trial, evidence was submitted regarding Numatics' conduct both before and after the incident. That evidence related to Numatics' knowledge of its cylinders' deficiency, its failure to evaluate the safety of its products, and its failure to repair deficient cylinders already in use.
Prior to summation, the court dismissed the design defect and failure to warn claims, allowing Willner to proceed only on his strict liability claim of manufacturing defect against Numatics. Although any need for evidence of Numatics' conduct was thereby obviated, during summation, Vertical Reality's counsel again underscored Numatics' alleged malfeasance in using substandard parts in the construction of its cylinders "because [they were] cheaper." Numatics objected and moved for a mistrial. The trial court denied the mistrial motion, but instructed the jury to disregard counsel's comments concerning Numatics' conduct, explaining that evidence of Numatics' actions was not relevant to the remaining issues in the case.
Following summations, Numatics requested that the trial court give the following instruction to the jury regarding the applicability of Numatics' conduct in the *1016 context of Willner's manufacturing defect claim:
In a products liability case such as this one, negligence is not an issue for your consideration. You are not to focus on the conduct of the parties. Rather, the issue for your determination is on the condition of the products that have been alleged to be defective.... Likewise, if you find that a product is not defective, then you must find that in favor of that defendant as to plaintiff's claim, regardless of that defendant's conduct.
The judge denied that proposal and instead provided an instruction that substantially mirrored Model Jury Charges (Civil), 5.40B, "Manufacturing Defect" (2009):
Plaintiff has made a manufacturing defect allegation against the Defendant, Numatics, alleging that the cast retainer that was on the cylinder at the time of the accident contained a void and was weaker and therefore rendered it defective. Numatics denies this claim.
**73 Let me give you some applicable concepts when dealing with the claim of a manufacturing defect, and then I'll explain what the Plaintiff must prove to establish a defect in manufacturing.
So, a manufacturing defect may be established by proof that as a result of a defect or flaw, which happened during the production, or while in Defendant's control, the product was unsafe and that unsafe aspect of the product was a substantial factor in causing the Plaintiff's accident.
To establish this claim for a manufacturing defect, the Plaintiff must prove the following elements by a preponderance of the credible evidence: that the cylinder contained a manufacturing defect, which made the product not reasonably safe. To determine if the cylinder had a manufacturing defect, you must decide what the condition of the cylinder as planned should have been according to Numatics' design specifications or performance standards and what its condition was as it was made.
If you find there's no difference between these two conditions, then there's no manufacturing defect. If there was a difference you must decide if that difference made the cylinder not reasonably safe for its intended or reasonably foreseeable uses. If the answer is yes, then you found the cylinder to be defective. Plaintiff need not prove that Numatics knew of the defect, nor that Numatics caused the defect to occur.
Numatics' attorney requested a meeting with the judge at sidebar for clarification during the judge's reading of that charge, which the judge granted. The following conversation occurred:
Counsel: I assume, Judge, that if you made the request in writing and you did not instruct it, there's no way to reiterate it?
....
Counsel: If we made a request in writing that was omitted, for example, the negligence language. There's no need to address it any further at this point? You've ruled?
The Court: I think I -- I thought I ruled on everything this morning?
Counsel: Exactly. I just wanted to make sure. Thank you, Judge.
No formal objections were made to the judge's jury instruction as given.
During jury deliberations, the judge rejected the jury's request for a written copy of the judge's instructions, but re-read back his instruction related to the manufacturing defect claim.
The jury then sent a note to the judge, asking if it could still assign percentages of fault to both defendants if it found that Numatics' cylinder was not manufactured defectively. Numatics' counsel expressed *1017 concern, asserting that the jury's note cast **74 doubt on the jury's "understanding of the law and its application." The judge answered the jury's question in the negative, instructing the jury that if it found that there was no manufacturing defect in Numatics' cylinder, it could not then allocate any fault to Numatics.
The jury found that: Vertical Reality's rock wall was designed defectively and was a proximate cause of Willner's fall; Vertical Reality provided inadequate warnings, which were a proximate cause of Willner's fall; and Numatics' product was manufactured defectively and was a proximate cause of Willner's fall. The jury awarded Willner a total of $358,000, allocating seventy and thirty percent liability to Vertical Reality and Numatics, respectively.
Willner filed a notice of motion for attorney fees and costs, pursuant to Rule 4:58, which Numatics opposed. Following a hearing, the trial court awarded attorney fees of $62,963.00, costs of $12,160.83, and prejudgment interest of $115,727.70 as requested pursuant to Rule 4:58.
C.
Numatics appealed to the Appellate Division, contesting the trial judge's failure to instruct the jury regarding the trial evidence related to its conduct and the award of attorney fees and costs under Rule 4:58. With respect to the latter issue, Numatics argued that the trial court erred in granting Willner's motion for sanctions because its molded share of the total verdict ($107,400) did not exceed 120% of Willner's $125,000 offer of judgment.
The appellate panel affirmed in an unpublished per curiam opinion.
Concerning the part played by evidence of Numatics' conduct in the jury's deliberations, the panel found that because Numatics did not request a limiting instruction at trial, the trial court's decision not to provide one should be reviewed for plain error. Employing that standard, the panel found that the trial judge "provided the jury with a succinct and accurate instruction" in **75 response to the jury's question regarding the interplay between manufacturing defect and fault. The panel concluded that the trial judge's "pre- and post-deliberation instructions were proper and appropriate and did not constitute error, let alone plain error."
Finally, the panel found that our case law "does not compel the use of molded judgments in determining" whether sanctions should be awarded under Rule 4:58. Rather, the panel relied on Gonzalez v. Safe & Sound Security Corp., 185 N.J. 100, 124, 881 A.2d 719 (2005), and found that the appropriate figure to compare with the amount of the offer is "the amount of the jury's verdict." Accordingly, the panel found that because the jury verdict of $358,000 was greater than 120% of the $125,000 offer of judgment, the trial court's award of fees and costs was appropriate.
Numatics filed a petition for certification with this Court, challenging: (1) the standard that the Appellate Division employed in its review of the trial judge's jury instructions; (2) the trial court's instructions; and (3) the award of sanctions under Rule 4:58. We granted certification, 231 N.J. 197, 174 A.3d 503 (2017), and amicus curiae status to the New Jersey Association for Justice (NJAJ).
II.
A.
Numatics contests the Appellate Division's plain error review of the trial court's jury instruction. In doing so, Numatics rejects the Appellate Division's finding that it "did not object to the absence of a jury instruction as to the treatment of conduct evidence in the jury charge, which *1018 it now claims requires a new trial." Numatics believes that its counsel's jury charge request was sufficient to preserve the issue for appeal pursuant to Rule 1:7-2. Therefore, relying on Panko v. Flintkote Co., 7 N.J. 55, 80 A.2d 302 (1951), and Brown v. Kennedy Memorial Hospital-University Medical Center, 312 N.J.Super. 579, 711 A.2d 1370 (App. Div. 1998), Numatics asserts that the Appellate Division should have evaluated the trial court's actions for "whether [they] created the potential **76 for improper influences ... on the jury's verdict[,] thereby requiring a new trial."
Numatics argues that this failure to deliver the requested jury instruction led to confusion -- evidenced by the jury's question during deliberation -- and, ultimately, to a wrongful verdict against it. According to Numatics, the proper inquiry in a manufacturing defect claim focuses solely on the safety of the product, rather than the reasonableness of the manufacturer's conduct. Thus, while Numatics concedes that "evidence of [its] conduct was conditionally relevant and thereby admissible at trial," it stresses that, once the design defect and failure to warn claims against it were dismissed, "it became incumbent upon the trial court and the parties to ensure that the jury's use of this information was limited to the scope of this information's relevance."
Finally, Numatics disputes the Appellate Division's award of attorney fees and costs under Rule 4:58. Numatics argues that under this Court's decision in Wadeer v. New Jersey Manufacturers Insurance Co., 220 N.J. 591, 110 A.3d 19 (2015), for the purposes of offer of judgment sanctions, plaintiffs' offers should be compared to defendants' actual, proportionate liability -- not the jury verdict in total. Numatics impresses that "[a]ny other result would be incongruous, as it would subject individual defendants to sanctions based on the collective liability of all defendants, including those with different legal and financial interests." Therefore, Numatics contends that because the jury's verdict apportioned thirty percent of the liability to Numatics, its share of the verdict was $107,400 -- less than the $125,000 offer of judgment itself, let alone 120% greater than the same.
B.
Willner urges the Court to affirm the Appellate Division's opinion, first agreeing that plain error was the correct standard to apply in reviewing the trial court's jury instructions regarding conduct evidence because Numatics' "counsel never objected to the [trial judge's] instruction or requested a limiting instruction." Willner avers that because conduct evidence was, in fact, relevant **77 to all facets of his claims at trial, the trial court's instructions did not amount to reversible, plain error.
Willner also notes that Wadeer was narrowly decided in the uninsured/underinsured motorist (UM/UIM) setting and that Numatics mistakenly attempts to broaden the reach of that decision. Willner emphasizes that Gonzalez clearly dictates that the criteria for sanctions under Rule 4:58 compare the total jury verdict to the plaintiff's total offer. Thus, Willner urges this Court to affirm the trial court's imposition of attorney fees and costs.
C.
NJAJ supports Willner's argument that the trial court and Appellate Division properly interpreted Rule 4:58 in imposing sanctions on Numatics. NJAJ highlights the plain language of the rule, which expressly compares "a monetary judgment" to the offer. (quoting R. 4:58-1). NJAJ advises that "[i]f the Rule was to apply to the judgment based upon fault, the plain language should reflect that requirement." NJAJ therefore urges this Court to adhere *1019 to our decision in Gonzalez, where we held that the amount of an offer is to be related to the jury's full verdict, rather than the amount of each defendant's respective liability.
NJAJ argues that, if we decide that a money judgment should be allocated by the molded verdict's percentage of fault, we should similarly allocate the original offer by that percentage as well. NJAJ explains that Numatics would still be liable for sanctions under that framework because the portion of damages for which the jury found it liable ($107,400) exceeded 120% of its thirty percent proportion of Willner's offer ($45,000). Consequently, NJAJ recommends that we affirm the trial court's award of attorney fees and costs.
III.
A.
We address first the issue of the trial judge's jury instruction regarding evidence of Numatics' conduct that was adduced at trial.
**78 Strict products liability claims are governed by N.J.S.A. 2A:58C-2, which provides that
[a] manufacturer ... shall be liable ... if the claimant proves by a preponderance of the evidence that [a] product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it ... deviated from the design specifications ... of the manufacturer ... or ... failed to contain adequate warnings ... or ... was designed in a defective manner.
Thus, strict liability claims can be brought by claimants under three theories of liability: manufacturing defect, failure to warn, or design defect.
A successful showing of the latter two theories necessarily implicates the defendant manufacturer's conduct. Feldman v. Lederle Labs, 97 N.J. 429, 451, 479 A.2d 374 (1984) ("When the strict liability defect consists of an improper design or warning, reasonableness of the defendant's conduct is a factor in determining liability.").
Conduct evidence, however, is never relevant to a claim of manufacturing defect. Under that theory of strict products liability, the only inquiry for the factfinder to make is whether the product in question was assembled "in a substandard condition based on the manufacturer's own standards or identical units that were made in accordance with the manufacturing specifications." Myrlak v. Port Auth. of N.Y. & N.J., 157 N.J. 84, 98, 723 A.2d 45 (1999). A factfinder's sole responsibility in those cases is to evaluate (1) the manufacturer's design specifications and (2) the actual condition of the product that allegedly caused the claimant harm, and compare the two.
Numatics therefore argues that once the failure-to-warn and design-defect claims against it were dismissed at trial, the judge should have issued a limiting instruction, explaining to the jury that any evidence of Numatics' conduct that was proffered at trial was not relevant to the remaining claims. Numatics contends that the judge's eventual jury instruction was insufficient and constituted reversible error because it caused jury confusion, as evidenced by the question posed during deliberation.
**79 Pursuant to Rule 1:7-2, in order to preserve an issue for appeal, "a party ... shall make known to the court specifically the action which the party desires the court to take or the party's objection to the action taken and the grounds therefor." Such an objection may be offered "in open court, in the absence of the jury." R. 1:7-2.
"Without an objection at the time a jury instruction is given, 'there is a presumption *1020 that the charge was not error and was unlikely to prejudice the defendant's case.' " State v. Montalvo, 229 N.J. 300, 320, 162 A.3d 270 (2017) (quoting State v. Singleton, 211 N.J. 157, 182, 48 A.3d 285 (2012) ). Therefore, "the failure to object to a jury instruction requires review under the plain error standard." State v. Wakefield, 190 N.J. 397, 473, 921 A.2d 954 (2007) (citing State v. Bunch, 180 N.J. 534, 541, 853 A.2d 238 (2004) ). Under that standard, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. We have held that merely suggesting a jury instruction to the trial judge is not sufficient to preserve an issue for appeal or to preclude plain error review -- the appealing party must have objected to the instruction as given to do so. Dynasty, Inc. v. Princeton Ins. Co., 165 N.J. 1, 17-18, 754 A.2d 1137 (2000).
When a party has brought an alleged error to the attention of the trial court, though, the error "will not be grounds for reversal [on appeal] if it was 'harmless.' " State v. J.R., 227 N.J. 393, 417, 152 A.3d 180 (2017) (quoting State v. Macon, 57 N.J. 325, 338, 273 A.2d 1 (1971) ). An error cannot be harmless if there is "some degree of possibility that [the error] led to an unjust result." State v. Lazo, 209 N.J. 9, 26, 34 A.3d 1233 (2012) (alteration in original) (quoting State v. R.B., 183 N.J. 308, 330, 873 A.2d 511 (2005) ). For an error to be reversible under the harmless error standard, "[t]he possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." Ibid. (quoting R.B., 183 N.J. at 330, 873 A.2d 511 ).
**80 B.
With those principles in mind, we affirm the opinion of the Appellate Division with respect to the jury instruction issue.
Regarding the applicable standard of review, we disagree with the appellate court and also reject Numatics' request to adopt a standard unfounded in our case law.
Numatics urges us to apply the holdings of Panko and Brown to review the trial judge's instruction for whether it improperly influenced the jury, resulting in jury confusion. But such an argument misconstrues the thrust of those cases. In both, the alleged impact on the jury's verdict was created by extraneous sources. See Panko, 7 N.J. at 60, 80 A.2d 302 (granting new trial after non-party placed telephone call to juror to obtain "information which would have a bearing on the verdict in the pending case"); Brown, 312 N.J. Super. at 589-91, 711 A.2d 1370 (affirming grant of new trial after exhibits not meant for jury were left in jury room and viewed by jurors). As no such outside interference has been alleged here, that line of cases provides no guidance to our analysis in the instant appeal.
The proper standards of review of jury instructions are well-settled: if the party contesting the instruction fails to object to it at trial, the standard on appeal is one of plain error; if the party objects, the review is for harmless error.
Although offering a jury instruction alone is not adequate to preserve an issue for appeal under Rule 1:7-2, Dynasty, 165 N.J. at 17-18, 754 A.2d 1137, Numatics' counsel did more than suggest a charge. Counsel also requested a sidebar with the judge after the jury was instructed to confirm the judge's decision not to adopt counsel's preferred charge and to confirm that no further objection was necessary.
*1021 We find that such a post-instruction colloquy is sufficient to preserve Numatics' right to contest the charge on appeal pursuant to our rules. See R. 1:7-2. The standard of review for Numatics' challenge is thus harmless error.
**81 Assessing Numatics' argument through that lens, we hold that the judge's actions, if error, were harmless. It is clear that while evidence of Numatics' conduct was certainly germane to Willner's failure to warn and defective design claims, it was rendered irrelevant by the dismissal of those causes of action. We agree with the Appellate Division that a limiting instruction would have been appropriate at that time. However, in the absence of such an instruction, the judge acted appropriately to direct the jury's attention away from any newly irrelevant evidence of Numatics' negligence. When Vertical Reality's counsel highlighted Numatics' misconduct in summation, the judge quickly instructed the jury that such evidence was not to be considered. Further, the judge's adoption of the model charge for Willner's remaining manufacturing defect claim effectively informed the jury of the only evidence necessary for its decision. Consequently, there was no genuine possibility that the judge's actions led the jury to reach a verdict it otherwise would not have reached.
We accordingly affirm the Appellate Division's ruling on the trial judge's instruction.
IV.
We turn now to the trial court's award of attorney fees and costs.
The offer of judgment rule, R. 4:58, was "designed ... as a mechanism to encourage, promote, and stimulate early out-of-court settlement of ... claims that in justice and reason ought to be settled without trial." Schettino v. Roizman Dev., Inc., 158 N.J. 476, 482, 730 A.2d 797 (1999) (quoting Crudup v. Marrero, 57 N.J. 353, 361, 273 A.2d 16 (1971) ). To incentivize such pre-trial settlement, "the rule imposes financial consequences on a party who rejects a settlement offer that turns out to be more favorable than the ultimate judgment" by a certain amount. Ibid.
To invoke the rule, "any party may, at any time more than 20 days before the actual trial date, serve on any adverse party, **82 without prejudice, and file with the court, an offer to take a monetary judgment in the offeror's favor ... for a sum stated therein." R. 4:58-1(a).
Generally, when a suit involves one plaintiff and one defendant, "if the offer of a [plaintiff] is not accepted and the [plaintiff] obtains a money judgment, in an amount that is 120% of the offer or more," the plaintiff shall be awarded sanctions, consisting of attorney fees, expenses, and costs of suit, including prejudgment interest, from the defendant from the time of the offer. R. 4:58-2(a). Conversely, in single plaintiff-single defendant cases, when the defendant makes the offer of judgment in accordance with Rule 4:58-1, if the plaintiff obtains a money judgment that is "favorable to the [defendant] as defined by this rule," the defendant is awarded sanctions. R. 4:58-3(a). "A favorable determination ... under this rule is a money judgment ... in an amount ... that is 80% of [defendant's] offer or less." R. 4:58-3(b).
Rule 4:58-4(b) attempts to outline the respective sanctions framework for offers of judgment made by plaintiffs in cases involving a single plaintiff seeking a joint and several judgment from multiple defendants. It deals particularly with the role of counteroffers. Pursuant to that rule, if the plaintiff makes a global offer of judgment to all defendants and a single defendant makes a counteroffer of less than his pro rata share of the plaintiff's offer, calculated by dividing the amount of the plaintiff's *1022 offer by the number of defendants in the case, the defendant's counteroffer cannot be deemed an acceptance of the plaintiff's offer. R. 4:58-4(b). However, if a single defendant makes a counteroffer "that is no less than" 80% of its share of an eventual jury verdict -- as determined by the percentage of fault allocated by the jury -- it would be "inequitable" to impose sanctions on the counteroffering defendant. Pressler & Verniero, Current N.J. Court Rules, cmt. 6.1 on R. 4:58 (Pressler, cmt. 6.1); see also R. 4:58-4.
The rule leaves unclear the circumstances triggering the imposition of sanctions on an individual defendant when a single plaintiff **83 makes a global offer to multiple defendants, there is no acceptance of the offer, and no counteroffer is made in response.
Each of the parties in this case argues that either Wadeer or Gonzalez should govern our decision here because the rationales guiding those decisions are applicable here. But both of those cases were decided in explicitly limited circumstances not present here.
In Wadeer, we determined that comparing the amount of a reduced verdict with an offer amount in the UM/UIM context was inappropriate because the lessening of the verdict was performed by the judge to conform to the plaintiff's insurance policy's limit, not to "reflect allocation of liability." 220 N.J. at 611, 110 A.3d 19. We held that any other outcome would contravene the aims of Rule 4:58 because insurance carriers would have no incentive to settle the case for an amount reasonably beneficial to plaintiffs, knowing that the amount measured against the offer can only be as high as the policy limit. Ibid. Our reasoning was similar in Gonzalez: in our Rule 4:58 sanctions inquiry, we declined to use a verdict that was artificially lowered by a decree of a bankruptcy court because doing so would disregard the rule's purpose of incentivizing settlement. 185 N.J. at 124-25, 881 A.2d 719. Here, Willner's verdict was molded only by the jury's apportioning of fault. Our analyses in Wadeer and Gonzalez are therefore irrelevant.
Moreover, neither of those cases directly addresses the requirements of Rule 4:58-4. They rely solely on the language of Rule 4:58-2. See Wadeer, 220 N.J. at 611-12, 110 A.3d 19 ; Gonzalez, 185 N.J. at 124-25, 881 A.2d 719. Rule 4:58-2 provides for the award of fees and costs to a plaintiff when the jury's verdict is greater than 120% of its offer to a defendant. Comparing the jury's full award of damages to a plaintiff to a single plaintiff's offer of judgment is uncomplicated. Doing the same in the joint and several liability setting is not.
We have found that, in offering judgment to multiple defendants, "plaintiffs are permitted to act in respect of the total **84 judgment." Schettino, 158 N.J. at 483, 730 A.2d 797 ; Pressler, cmt. 6.1 ("[T]he intention of R. 4:58-4 is to permit the [plaintiff] to deal exclusively in terms of the total judgment rather than to require him to accept pro rata shares from individual defendants."). Forcing plaintiffs to negotiate individually with defendants in settlement negotiations would create an unfair risk of settling with defendants that are ultimately found by juries to be significantly liable, for a smaller amount than the percentage of fault allocated to those defendants. The onus of that risk would "shift to plaintiffs, when evaluating the fairness of a settlement offer, the burden of determining a single defendant's share of liability." Schettino, 158 N.J. at 484, 730 A.2d 797. Thus, we have held that "plaintiffs need consider only an offer to settle the entire liability on behalf of all defendants." Ibid.
By the same token, mandating that individual defendants contemplate global offers from a single plaintiff, as advanced by Willner, is problematic as well. Such a *1023 requirement would force defendants who are likely less liable than their co-defendants to consider settling for an amount greater than their individual liabilities, simply to avoid significant sanctions.
This case illustrates the problem. The jury awarded Willner a total of $358,000 and found Numatics thirty percent responsible for those damages. Numatics' molded share of liability was therefore $107,400. Willner's offer of judgment was for $125,000, presented to all defendants. Under Willner's view, because the total verdict was greater than 120% of his offer, Numatics is liable for sanctions. This interpretation would dictate that the only way Numatics could have escaped an award of sanctions would have been to accept Willner's global offer -- for an amount greater than the amount that Numatics was ultimately determined to be at fault. We find such an outcome to be unfair.
Our offer of judgment rule must balance the competing interests of plaintiffs and defendants.
**85 The effect of the offer of judgment rule and how it should operate in this case is unclear. If the sanction of fee shifting is to be awarded, there must be advance notice of that consequence. Here, that did not happen. Consequently, it would be improper to shift fees and costs in this circumstance.
V.
Accordingly, we affirm the judgment of the Appellate Division with respect to the jury instruction, but reverse with respect to the award of attorney fees and costs.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion.