# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0564-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

P.S.M.,

     Defendant-Appellant.

_____

Argued March 3, 2026 – Decided April 29, 2026

Before Judges Gilson, Perez Friscia and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 21-07-0610.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Margaret McLane, of counsel and on the brief).

Hudson E. Knight, Assistant Prosecutor, argued the cause for respondent (Linda Estremera, Middlesex County Prosecutor, attorney; Hudson E. Knight, of counsel and on the brief).

PER CURIAM

Defendant P.S.M. appeals from an October 11, 2024 judgment of conviction (JOC) entered after he was found guilty by a jury of four counts each of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault, N.J.S.A. 2C:14-2(b), and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).  We affirm.

I.

The State alleged defendant sexually assaulted his girlfriend's granddaughter, T.S., on numerous occasions when she was nine to eleven years old.[1]  We summarize the relevant procedural history and evidence presented at defendant's trial in July 2023.

T.S. lived with her grandmother, T.R., and defendant since she was an infant and referred to them as "mom" and "dad" because she considered them "husband and wife."  On August 1, 2020, T.S. sent a message to her close friend, D.O., who was fourteen years old, saying she had something "very important"

---

[1]  We use initials to protect the confidentiality of victims of sexual assault or abuse.  R. 1:38-3(c)(9).

2                                                                          A-0564-24

to tell her.[2]  When D.O. arrived home later that day, T.S. sent her a text message stating, "[o]kay.  Here it goes. . . . My dad does[ not] abuse me but he use[s] me for my body."  D.O. responded "[h]uh? I do[ not] get it."  The text conversation continued:

> T.S.:  He uses me for my body but he does[ not] abuse me.  It[ is] pretty much he only uses me for S.
>
> . . . .
>
> D.O.:  What is S?
>
> T.S.:  Sex.  H[e] does[ not] put it all of the way in because he claims he "loves me" but I[ am] scared he [is] going to do that tomorrow and I do[ not] know what to do and this time I[ am] not lying. I swear on my grandma that passed away.

D.O. showed the messages to her mother, L.R., who "grabbed her phone [and] took over the phone and . . . started texting [T.S.]"  The conversation between T.S. and L.R., communicating as D.O., continued as follows:

> L.R.:  What exactly he does to you?
>
> T.S.:  He make[s] me suck his dick and make[s] me have sex with him but he probably does that because he say[s] he love[s] me.
>
> L.R.:  Oh, my God, are you kidding me?

---

[2]  The text messages between T.S. and D.O. were introduced as evidence at trial and provided to the jury.  They are not included in the appellate record and our understanding of the content of the messages is based on the trial transcripts.

A-0564-24

T.S.: But he does[ not] put it all in because I cry.

    . . . .

L.R.: You cannot stay quiet.

T.S.: But I have to.

L.R.: This is something serious.

T.S.: I[ am] scared he will do something to my mom. That[ is] . . . why . . . I[ am] so . . . [over]protective of her. I know I can. But then my mom cannot pay the bills and I do[ not] want her to do that.

[D.O.], I[ am] scared of him every day. That[ is] why when I go to your house I always say I[ am] scared of him but I have to make up an excuse. I[ am] scared of him every day because I[ am] scared of him going to do something to me when my mom leaves to work. I . . . need help but I do[ not] want him to go to jail. I d[o not] know what to do.

    . . .

L.R.: [T.S.], this is something serious and we have to do something about it.

T.S.: But what? I can[not] do anything. I[ am] useless and worthless.

L.R. took D.O. to the local police station, where they both gave statements to the police and provided screenshots of their messages with T.S. The following day, Detective Linda Infusino of the Middlesex County Prosecutor's

A-0564-24

Office (MCPO) Special Victims Unit (SVU) conducted a recorded forensic interview of T.S.

During the recorded interview, which lasted over two hours, T.S. initially stated she did not know why she was being interviewed and denied anyone touched her "private part" or "asked [her] to touch . . . their private part." Detective Infusino, who had already reviewed the text messages T.S. sent the day before, asked T.S. several times if she had ever been subjected to inappropriate touching. At one point, Detective Infusino left the room for approximately twenty minutes to consult with her colleagues.

After she returned, she continued to question T.S. Eventually, Detective Infusino told T.S. she had seen her text messages with D.O. and "want[ed] to hear it from [her] about that part." Detective Infusino never mentioned the content of the messages or any allegations about defendant or sexual abuse.

In response, T.S. told Detective Infusino:

> I[ am] just . . . well, in the beginning of this, . . . I do [not] really want you to tell my mom because I[am] scared I might get in trouble when I get home, even though like, sometimes you have to tell my mom about stuff. But it[ is] like, this is like too . . . but in the beginning she was like, um, do[ not] say something bad about your dad because she[ is] like scared he[ is] going to go to jail because, . . . it[ is] like kind of rough to pay the bills.

5

A-0564-24

T.S. said she was "scared because [she] d[id not] want [her] dad . . . to go to jail," and if she did tell Detective Infusino "what[ was] going on, [she was] just . . . scared that he[ was] probably going to break out" of jail.

T.S. then told Detective Infusino the first time defendant touched her inappropriately she was "probably . . . nine years old" but did not remember details. She said her memory was "hazy . . . when you[ are] little, you do[ not] . . . really remember everything." T.S. alleged that defendant had "been doing it for as long as [she] c[ould] remember."

T.S. stated defendant forced her to "suck . . . his private part" and ejaculated in her mouth, touched her breasts and vagina over and under her clothes, "put [his penis] in [her] butt" "[m]aybe four or five" times, "put his [penis]" in her vagina "maybe twice," and put his mouth on her vagina "[p]robably once or twice." She recalled defendant "pulling [her] hair and slapping [her] and hurting [her] a little bit" because she "was sucking it worse." The last incident of abuse occurred a week before the interview.

T.S. never told her mother what was happening because she was "just going to keep [defendant] . . . here because . . . she[] obviously[] can[not] pay the bills." Defendant always told her "do[ not] tell anyone . . . because then [he was] going to go to jail and [she] d[id not] want [him] to go to jail."

6

A-0564-24

On August 5, 2020, defendant was arrested. He was indicted by a Middlesex County grand jury and charged with four counts each of aggravated sexual assault (counts one, four, seven, and ten), sexual assault (counts two, five, eight, and eleven), endangering the welfare of a child (counts three, six, nine, and twelve), and third-degree failure to comply with his Megan's Law registration requirements, N.J.S.A. 2C:7-2(d)(1) (counts thirteen to sixteen).[3]

The State moved to admit the forensic interview as evidence at trial pursuant to N.J.R.E. 803(c)(27), and the court conducted a N.J.R.E. 104 hearing on June 7, 2022. On February 2, 2023, the court entered an order granting the motion supported by a written opinion. The court determined T.S.'s "initial hesitation to open[]up to or discuss with the [d]etective her recollection of events" did not "undermine the reliability . . . and statements provided." The

---

[3]    Defendant was subject to Megan's Law reporting and registration requirements, N.J.S.A. 2C:7-1 to -23, based on a prior conviction. Counts thirteen through sixteen of the indictment were severed from counts one through twelve for trial. On July 22, 2024, defendant pleaded guilty to count thirteen of the indictment and counts fourteen through sixteen were dismissed. In the same October 11, 2024 JOC that is the subject of this appeal, defendant was sentenced to three years in prison on count thirteen concurrent to the sentences imposed on counts one through twelve. Defendant did not brief any arguments relating to his conviction and sentence for violation of N.J.S.A. 2C:7-2(d)(1), and those arguments are waived. See State v. Shangzhen Huang, 461 N.J. Super. 119, 125 (App. Div. 2018) (issues not briefed are deemed waived).

A-0564-24

court recognized T.S. "was noticeably shy and clearly embarrassed about answering questions regarding sexual situations."

It found Detective Infusino's "[l]eading questions and interview techniques . . . were not . . . improper." She "did not engage in cross-examination," or in "'third-degree' techniques, nor did she pose question upon question in an unrelenting or continuous fashion that may have suggested to T.S. that her responses, or her failure to respond, were somehow wrong or displeasing to the detective." Detective Infusino's "direct statement to T.S. that she had read the . . . text messages" did not "suggest to T.S.[] what her responses should be" or "improperly guide[] the content of T.S.'s responses subsequently provided."

The court found T.S.'s "representations were consistent and expounded on her . . . text messages . . . to D.O. and supplied a genuine level of detail that served to indicate T.S. was" telling the truth. The court determined that "the statements and descriptions offered by T.S." were not "molded by the questions posed during the interview." "There was nothing communicated . . . to insert into the child's recollections . . . a preconceived notion of what occurred or happened," and there was no basis to find T.S.'s responses "were either directed by or influenced by a conversation with any family member, parent, or peer."

A-0564-24

II.

Relevant to the issues raised on appeal, the State called T.S., D.O., L.R., T.R., and Detective Infusino as witnesses at trial.[4] Defendant did not testify or present any other evidence.

D.O. and L.R. testified regarding their text message exchange with T.S. on August 1, 2020, and D.O.'s relationship with T.S. T.R. testified that she and defendant were not married but lived together "as husband and wife" from "2011 through 2020." Defendant helped her "[w]ith the house expenses" and "with [T.S.]" She worked in a warehouse and in 2018 and 2019 worked overnight from "10[:00 p.m.] to 7[:00 a.m.]" When she worked at night, defendant would watch T.S. and "was . . . the only person that was there at home with her."

T.S. testified that when T.R. worked overnight, defendant would watch her and make her sleep in his bedroom. Defendant "sexually assaulted" her "[t]oo many [times] to count." Defendant would touch her "vagina, boobs, waist . . . back . . . [and] butt." The abuse "would start off with [her] clothes on and then . . . progressively . . . [her] clothes would be off." Defendant would also make her touch his penis and "suck his penis" until he ejaculated.

---

[4] By the time of trial, Detective Infusino had been promoted to sergeant. We refer to her as detective for consistency. No disrespect is intended.

9

Sometimes he would "rub [his penis] . . . on [her] vagina or . . . put a little bit in." Defendant penetrated her vagina with his penis "two or three times." Defendant "would put his penis in [her] mouth probably like every time."

He also "touch[ed her] butt" with "[h]is hands and his penis." T.S. testified defendant penetrated her "butt" with his penis "[t]wo or three times." When that occurred, "[she] was screaming to stop" because "it hurt" and defendant "gave [her] a pillow to put on [her] mouth so [she] would stop screaming but [her] screams were like really loud so he just . . . stopped." Defendant would also "use his mouth to . . . lick [her] vagina [and] suck on [her] boobs."

Defendant was physically violent with T.S. "[m]ore than once." On one occasion "he wanted [her] to suck his penis" and she "was[ not] doing it the right way apparently, to his standards, and he pushed [her] off and just started . . . hitting [her] all over [her] body." Defendant "threatened [her] mom, saying . . . if [she] d[id not] do this [he was] going to do it to her" and "threaten[ed her] friends and [said] . . . [he would] go and do it to them." Defendant would also tell T.S. "not to tell anyone" because she did not "want [him] to go to jail." The abuse stopped when she was eleven or twelve years old.

A-0564-24

Detective Infusino testified that she had been employed by the MCPO for ten years and had been assigned to the SVU for five years, completed a training program known as "Finding Words" to conduct forensic interviews of children, and is a certified forensic examiner. T.S. was eleven years old when Detective Infusino interviewed her on August 2, 2020. The recording of Detective Infusino's forensic interview of T.S. was then played for the jury.

On July 25, 2023, the court instructed the jury. Relevant to this appeal, the court instructed the jury in accordance with Model Jury Charges (Criminal), "Criminal Final Charge" (rev. Sept. 1, 2022), that

> The verdict must represent the considered judgment of each juror and must be unanimous as to each charge. This means all of you must agree if the defendant is guilty or not guilty on each charge. It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement. Each of you must decide the case for yourself, but to do so only after an impartial consideration of the evidence with your fellow jurors.
>
> In your deliberations do not hesitate to re-examine your own views or change your opinion if you are convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of one of your fellow jurors or for the mere purpose of returning a verdict. You are not partisans, you are judges of the facts.

11

Following the court's instructions, which concluded at approximately 4:00 p.m., the jury was dismissed for the day. Jury deliberations began when the jury returned the next morning, July 26.

At approximately 11:18 a.m. on July 26, the jury delivered a note to the court with a number of questions regarding the evidence presented and "request[ed] to watch the video of the interview with Detective Infusino after [T.S.] [d]raws in the room alone" and to "watch [T.S.'s] testimony to the court." Shortly thereafter, the jury sent a second note requesting "to watch [T.R.'s] testimony to the court." Before the court addressed those requests, the jury sent a third note requesting "[c]larification of [p]age [eleven] of the charges[:] Does oral penetration include oral in case he placed [his] penis in her mouth[?]" The jury also requested to "take a break between watching [T.S.'s] testimony and the interview with the detective."

The court played back T.R.'s testimony from 11:54 a.m. until 12:27 p.m., when the jury was dismissed for lunch. After the jury returned from lunch, the court noted that it had "discussed [their questions] with the attorneys" and reread the definition of "sexual penetration" contained in Model Jury Charge (Criminal), "Aggravated Sexual Assault – Victim Less Than [Thirteen] (N.J.S.A. 2C:14-2a(1))" (rev. Jan. 24, 2005). The court then replayed T.S.'s

12

testimony from 2:11 p.m. until 3:41 p.m., at which time the jury was dismissed for the day.

On July 27, the court replayed the portion of the forensic interview the jury requested to see from 9:35 a.m. until 11:20 a.m. without objection, after which the jury returned to the jury room. At approximately 12:00 pm., the jury sent the court a note asking, "[w]hat happens if one or more jurors do not agree with the charges?"

In response, the court instructed the jury that their "deliberations ha[d] barely begun" and were "for the most part in [their] infancy." It then instructed the jury, without objection, that

> your job here or your function here is not to deliberate about the propriety of the charges raised. Charges are contained within the indictment. Your job is to determine what the facts are in this case and apply those facts to the law as I gave it to you regarding those charges. As I had also instructed, you are to apply that law as I gave it to you regardless of what you think the law should be or whether you understand properly what the law is, that is your function. I[ am] going to return you to your deliberations. I ask that you perform the functions as I have instructed. If you[ would] like me to read the charge again, I will. But the charges have been set. Your job is to determine the facts, apply the law and make a determination.

The jury was then dismissed for lunch from 12:20 p.m. until 1:30 p.m. At approximately 4:21 p.m., the jury sent another note stating:

13

A-0564-24

[one to two] jurors do not agree with the majority [and] do not believe in the evidence presented. We have discussed each charge at length, but are unable to move forward. [One] juror believes that no sexual acts occurred at any point between [April 9, 2018 – July 26, 2020]. Therefore, we cannot reach a verdict.

At approximately 4:30 p.m., after discussing the jury's latest note with counsel, the court instructed the jury, without objection, that

[y]esterday, we started the playback of the testimony that you wanted to hear and we completed that this morning . . . I then released you to lunch, I think . . . you started your deliberation, and then you were released to lunch and brought back. There[ has] been by my count just over four hours–four and a half hours of deliberation to this point. And there are [twelve] counts in here in this . . . particular case. Everything right now is fresh. Your arguments are fresh in your mind. The evidence is fresh in your mind. I[ am] going to bring you back tomorrow. I told you all when we started that the schedule may change. I want you to keep working with one another. I want you to keep deliberating. I[ am] going to ask that you be back in the jury room no later than 8:30 [a.m.] tomorrow morning.

The jury resumed their deliberations on July 28. At approximately 11:05 a.m., the jury sent a note requesting "to watch [D.O.] and [L.R.]'s testimony." Before the court addressed that request, at approximately 11:16 a.m., the jury sent another note stating:

We have one to two jurors who refuse to find the defendant guilty unless there is physical evidence, and

14

A-0564-24

assume that the testimony . . . of [T.S.] and the detective is false. We have been trying to get past this impasse for the last [three] days. According to the instructions given it states "your verdict, whatever it may be as to each crime charged must be unanimous. Each of the [twelve] members of the deliberating jury must agree as to the verdict." At this point we are not able to meet this criteria. We have tried a[d] nauseum to discuss the charges [and] evidence presented but [two] people refuse to be impartial [and] openminded.

In response, defense counsel asked the court "just to make it clear that just because they[ are] not agreeing with them does[ not] mean that they are not following the [c]ourt's instructions of being impartial and open-minded." Defense counsel clarified he was "asking the [c]ourt to instruct the . . . jurors not to bully the other jurors."

The court noted that it was "somewhat confusing" that the jury sent the "first note indicating . . . that they are desirous of hearing the testimony play[]back of" D.O. and L.R., and "then [ten] or [fifteen] minutes later . . . the second note . . . indicating that . . . they do[ not] believe that they[ are] not going to break this [deadlock]." The court then replayed the testimony of D.O. and L.R. for the jury and dismissed them for lunch.

The jury returned from lunch at approximately 2:09 p.m. and the court instructed the jury, without objection, as follows:

15

A-0564-24

This morning and, again, in response to the request that was made . . . we replayed that testimony offered, . . . by [D.O.] . . . and . . . [L.R.] . . . I had also advised the jury that I had also received the second note that they had sent out following the request to review that testimony. It, again, indicates that, at this time and prior to that rehearing, they, again, remain unable to, . . . reach a verdict in this case. . . . [W]ith the video having been played, however . . . I am going to continue your deliberations at this time in an effort to try and reach a verdict in this case.

I also advised you that I would provide you an additional instruction. That instruction is this. Through various . . . instructions that I gave you throughout the course of this hearing, I advised you of your duty as jurors to consult collegially with one another and to deliberate with a view towards reaching a verdict in this case. It is hopeful that you will be able to do that without violence to individual judgment. Each of you must decide the case for yourself, but you are to do so only and after an impartial consideration of the evidence with your fellow jurors. This is to be done as a whole. During your deliberations, do not hesitate to reexamine your own views, and to change your opinion, if convinced it is erroneous. But, again, do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors.

The purpose of these collegial conversations between yourselves, deliberations between yourselves is to return a verdict. You are not partisans in this case. You are judges; judges of the facts as I have reminded you throughout the course of this proceeding. I am now asking that . . . with the audio testimony replayed that you, again, retire and continue your deliberations. And that you keep these comments and this instruction in

16

mind as you continue those deliberations. And you are to utilize them in conjunction with all of the other instructions that I[ have] given you in this case. Having said that, I[ am] going to have the officer now return you to the jury room for further deliberations. Thank you.

After the jury resumed their deliberations, defense counsel placed on the record that "the defense ask[ed] for a mistrial" in chambers, which the court denied. Counsel explained that the motion was "based on the note that . . . the jury sent . . . saying that . . . those two jurors who refused to find the defendant guilty unless there[ is] physical evidence . . . and based on the . . . charge, they cannot reach a unanimous verdict."

The court denied defendant's motion, stating:

> I[ have] given the instruction. I[ have] discussed this with counsel. . . . I[ am] not inclined to grant [defense counsel's] request at this time until the jury . . . indicates . . . further. I[ have] explained why. . . . [T]hey asked to hear the testimony earlier this morning. I gave them that opportunity. It was only after that request was made that they forwarded the second note. I gave them the opportunity to listen to the testimony as they requested. I then brought them back because it was . . . lunch. I gave them their lunch break. I brought them back. I told them before they left that I would instruct them further. I addressed their inability to reach a verdict. I gave them the instruction on further deliberation, commonly known as the <u>Allen</u> instruction. . . . [A]nd we are awaiting further information from them.

17

At approximately 3:30 p.m., the jury returned a unanimous verdict finding defendant guilty of all charges. After appropriate mergers, defendant was sentenced to concurrent terms of forty years in prison subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, and Megan's Law reporting and registration requirements, N.J.S.A. 2C:7-1 to -23, for each count of first-degree aggravated sexual assault and ten years in prison, subject to Megan's Law, for each count of second-degree endangering the welfare of a child.

III.

On appeal, defendant raises the following points for our consideration.

POINT I

DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE COURT'S INSTRUCTION THAT THE JURY'S "PURPOSE . . . IS TO RETURN A VERDICT" WAS UNDULY COERCIVE WHEN THE JURY HAD TWICE REPORTED THEY WERE HOPELESSLY DEADLOCKED.

POINT II

THE COURT ERRED IN ADMITTING THE TENDER-YEARS HEARSAY STATEMENTS BECAUSE THEY WERE NOT TRUSTWORTHY.

Defendant also argues the court: (1) "should have granted a mistrial"; (2) "failed . . . to ask [the jury] if continued deliberations would be beneficial"

18

consistent with Model Criminal Jury Charge (Criminal), "Judge's Inquiry When Jury Reports Inability to Reach Verdict" (approved June 10, 2013); (3) did not ask the jury if they would have been satisfied with a readback of the transcript to T.S.'s forensic interview rather than re-watching the video; (4) did not provide the instruction Model Criminal Jury Charge (Criminal), "Playback of Testimony" (approved April 6, 2012) after the forensic interview was replayed; and (5) improperly denied defendant's motion to compel production of the MCPO's standard operating procedures for interviewing child victims of sexual offenses.

IV.

"Appropriate and proper charges to a jury are essential for a fair trial." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Daniels, 224 N.J. 168, 180 (2016)). "The proper standards of review of jury instructions are well-settled: if the party contesting the instruction fails to object to it at trial, the standard on appeal is one of plain error; if the party objects, the review is for harmless error." State v. Cooper, 256 N.J. 593, 607 (2024) (quoting Willner v. Vertical Reality, Inc., 235 N.J. 65, 80 (2018)). We are unpersuaded by defendant's argument that the court's supplemental instruction regarding continued deliberations was "unduly coercive" and deprived him of a fair trial.

19

In this case, defendant did not clearly raise a timely objection to the court's supplemental instruction, but neither party contends the plain error standard applies. We will, therefore, review for harmless error. We note, however, that even if we used the plain error standard, the result would be the same. A harmless error occurs when there is "some degree of possibility that [the error] led to an unjust result." State v. Baum, 224 N.J. 147, 159 (2016) (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)). "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." Cooper, 256 N.J. at 608 (alteration in original) (quoting Baum, 224 N.J. at 159).

Our Supreme Court "has repeatedly held that portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect." State v. Wilbely, 63 N.J. 420, 422 (1973). "The charge must be read as a whole in determining whether there was any error." State v. Torres, 183 N.J. 554, 564 (2005). When addressing a supplemental instruction, "the question is whether the supplemental instruction . . . improperly influenced the dissenting jurors to change their votes." State v. Figueroa, 190 N.J. 219, 238 (2007).

20

In State v. Czachor, our Supreme Court prohibited the use of jury instructions that coerce a jury to return a verdict because doing so is "inconsistent with jury freedom and responsibility" and "does not permit jurors to deliberate objectively, freely, and with an untrammeled mind." 82 N.J. 392, 402 (1980). The Court disapproved of the then-existing model jury charge because it "repeatedly emphasize[d] a 'duty' to agree on a verdict," id. at 405, and recommended the adoption of a model charge substantially identical to the current version of Model Jury Charge (Criminal), "Final Charge for Further Jury Deliberations" (approved Jan. 14, 2003), Ibid. n.4. The Court subsequently explained that it approved this charge because it "would avoid pressuring dissenting jurors into surrendering their 'honest convictions' about guilt or innocence merely to reach a unanimous verdict." Figueroa, 190 N.J. at 221.

Defendant contends the court's instruction on further deliberations deviated from the model charge and was unduly coercive. Specifically, instead of instructing the jury, "do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict," the court instructed the jury, "do not surrender your honest conviction as to the weight or effect of the evidence

A-0564-24

solely because of the opinion of your fellow jurors. The purpose of these collegial . . . deliberations between yourselves is to return a verdict."

While the court deviated from the model jury charge by stating the "purpose of these collegial . . . deliberations between yourselves is to return a verdict," we are convinced that when the court's instructions are considered as a whole, the deviation did not "improperly influence[] the dissenting jurors to change their votes." Figueroa, 190 N.J. at 238. Before deliberations began, on July 25, the court properly instructed the jury, in conformity with Model Jury Charge (Criminal), "Criminal Final Charge," not to "surrender your honest conviction as to the weight or effect of the evidence . . . for the mere purpose of returning a verdict." More importantly, the final instruction the court gave on July 28, considered in its entirety, was not unduly coercive.

In that final charge, the court instructed the jury it was their "duty . . . to consult collegially with one another and to deliberate with a view to reaching a verdict in this case. It is hopeful that you will be able to do that without violence to individual judgment." The court continued, "[e]ach of you must decide the case for yourself, but you are to do so only after an impartial consideration of the evidence with your fellow jurors." And, the court instructed the jury, "do

22

not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors."

When considering the impact of an error in a jury instruction, we must read the charge "as a whole." Torres, 183 N.J. at 564. We cannot, as defendant asks us to do here, review "that portion[] of [the] charge alleged to be erroneous . . . in isolation." Wilbely, 63 N.J. at 422. Based on all the relevant instructions the court provided in this case, including the accurate portions of the final charge it gave on July 28, we are convinced the instruction given did not improperly "pressure[] dissenting jurors into surrendering their 'honest convictions' about guilt or innocence merely to reach a unanimous verdict." Figueroa, 190 N.J. at 221. The court's error, therefore, was harmless.

V.

We are convinced the court correctly denied defendant's motion for a mistrial. "The grant of a mistrial is an extraordinary remedy . . . " State v. Yough, 208 N.J. 385, 397 (2011). "Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.' Appellate courts 'will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice.'" State v. Smith, 224 N.J.

23

36, 47 (2016) (citations omitted) (first quoting State v. Harvey, 151 N.J. 117, 205 (1997); and then quoting State v. Jackson, 211 N.J. 394, 407 (2012)).

The court "has discretion to require further deliberations after a jury has announced an inability to agree." State v. Adim, 410 N.J. Super. 410, 423 (App. Div. 2009) (citing Figueroa, 190 N.J. at 235). However, "exercise of that discretion is not appropriate 'if the jury has reported a definite deadlock after a reasonable period of deliberations.'" Id. at 424 (quoting Czachor, 82 N.J. at 407). "In deciding whether the period of deliberations has been 'reasonable,' 'a judge should weigh all the relevant circumstances including the length and complexity of the trial.'" Ibid. (quoting Czachor, 82 N.J. at 407).

In this case, defendant moved for a mistrial after the jury advised the court, at approximately 11:16 a.m. on July 28, that there were "one or two jurors who refuse to find the defendant guilty unless there is physical evidence and assume that the testimony . . . of [T.S.] and the detective is false." As the court recognized, this note was delivered nearly simultaneously with another note requesting playback of the testimony of D.O. and L.R. Defendant's motion for a mistrial was made shortly after the jury heard that testimony played back and before the jury resumed their deliberations.

24

Moreover, by our estimate, the jury had deliberated for less than ten hours before defendant requested a mistrial.  Most of the day on July 26 and 27 was consumed by playbacks of testimony and the forensic interview requested by the jury.  The jury only deliberated on July 28 until approximately 11:05 a.m. when they requested the playback of the testimony of D.O. and L.R.  Considering all the relevant circumstances, there is no basis for us to find the court misapplied its discretion by denying defendant's motion for a mistrial and requiring the jury to continue its deliberations.

We are unconvinced by defendant's claim that the court erred by failing to inquire of the jury whether further deliberations would likely result in a verdict in accordance with Model Jury Charge (Criminal), "Judge's Inquiry When Jury Reports Inability to Reach Verdict" (approved June 10, 2013).  Because this argument is raised for the first time on appeal, we review for plain error.

The plain error standard requires a determination of:  "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' R[ule] 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'"  State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225

25

N.J. 66, 79 (2016)). "The mere possibility of an unjust result is not enough." Funderburg, 225 N.J. at 79. The error "must be evaluated 'in light of the overall strength of the State's case.'" State v. Singh, 245 N.J. 1, 13-14 (2021) (citing R. 2:10-2) (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)).

In Figueroa, the Court held that "it is not always necessary for the court to" ask the jury "whether further deliberations w[ould] likely result in a verdict" when the record reflects a "brevity of the deliberations." 190 N.J. at 239-40. As discussed, the jury in this case had only been deliberating sporadically and briefly over the course of less than three days. There is no basis for us to find error, much less plain error, because the court did not inquire of the jury whether further deliberations would likely result in a verdict.

## VI.

We are satisfied the court properly admitted the forensic interview of T.S. pursuant to N.J.R.E. 803(c)(27). We defer to a trial court's evidentiary rulings, including a trial court's determination that a child's statement meets the trustworthiness requirement of Rule 803(c)(27), unless the record reveals the trial court abused its discretion. State v. Garcia, 245 N.J. 412, 430 (2021); State v. P.S., 202 N.J. 232, 250-51 (2010).

26

This deference is rooted in the understanding that "'the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)).  Under this standard, a trial court's evidentiary ruling will be reversed only if we are "convinced that 'the . . . ruling is so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting State v. J.A.C., 210 N.J. 281, 295 (2012)).

N.J.R.E. 803(c)(27), provides:

> A statement made by a child under the age of [twelve] relating to sexual misconduct committed with or against that child is admissible in a criminal . . . case if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse.

When determining whether a statement is sufficiently trustworthy to warrant its admission under N.J.R.E. 803(c)(27), a court must consider "the totality of the circumstances."  State v. P.S., 202 N.J. 232, 249 (2010).  Our

A-0564-24

Supreme Court has identified the following "non-exclusive list of factors relevant to evaluating the reliability of out-of-court statements made by child victims of sexual abuse": (1) the spontaneity of the statement, whether it was made without prompting or suggestive questioning; (2) whether the account provided by the declarant is consistently repeated; (3) the "mental state of the declarant"; (4) the "use of terminology unexpected of a child of similar age"; and (5) the declarant's "lack of motive to fabricate." Ibid. (citing Idaho v. Wright, 497 U.S. 805, 821-22 (1990)); see also State in the Int. of A.R., 234 N.J. 82, 103-04 (2018).

A trial court's analysis may additionally be informed by factors such as: (1) "a lack of investigatory independence"; (2) "the pursuit by the interviewer of a preconceived notion of what has happened to the child"; (3) "the use of leading questions"; (4) "a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers"; (5) "[t]he use of incessantly repeated questions"; (6) "[t]he explicit vilification or criticism of the person charged with wrongdoing"; and (7) "the interviewer's tone of voice, mild threats, praise, cajoling, bribes and rewards, as well as resort to peer pressure." State v. Michaels, 136 N.J. 299, 309-10 (1994).

A-0564-24

We have independently reviewed the forensic interview and are convinced the court properly addressed all the relevant factors in its thorough and well-reasoned February 2, 2023 written opinion. As the court determined, Detective Infusino did not "engage in cross-examination" of T.S. or "pose question upon question in an unrelenting or continuous fashion that may have suggested to T.S. that her responses, or failure to respond, were somehow wrong or displeasing to the detective." The court correctly determined that Detective Infusino's "statement to T.S. that she had read [her] text messages" with D.O. did not "suggest to T.S.[] what her responses should be" or "improperly guide[] the content of T.S.'s responses." We discern no basis to find the court misused its discretion by admitting the forensic interview.

We are also unpersuaded by defendant's argument that reversal is required because the court failed to ask the jury if a readback of the transcript of the forensic interview would have sufficed. This argument is raised for the first time on appeal, and we review for plain error.

"[T]he response to a jury's request for a readback of testimony or a replay of a video recording is vested in the discretion of the trial judge." State v. A.R., 213 N.J. 542, 555-56 (2013). It has long been the rule, however, that before a video-recorded statement is played back, the jury should be asked if a readback

of the statement would suffice. State v. Burr, 195 N.J. 119, 135 (2008); see also State v. Weston, 222 N.J. 277, 293 (2015) ("a replay of a videotaped statement during deliberations should only be conducted upon the jury's request, and after a determination that the jury's concerns cannot be addressed with a readback of testimony").

As defendant correctly argues, the State's case against him turned largely on T.S.'s credibility. Defendant argued Detective Infusino pressured T.S. during the forensic interview and her allegations during that interview were inconsistent with other statements she made. During her opening statement, defense counsel urged the jury to "keep in mind . . . how many times Detective Infusino asked [T.S.] if this happened" when they "watch that forensic interview."

There is no reason for us to conclude the jury or defense counsel would have been satisfied with a readback of the transcript of the forensic interview under the facts and circumstances of this case. In fact, although defendant raises this argument on appeal, he does not contend a sterile readback of the transcript would have been an appropriate substitute to viewing the recorded interview, especially after specifically urging the jury to pay close attention when they watched it. There is no basis, therefore, for us to find plain error.

Defendant's claim that reversal is required because the court did not read Model Jury Charge (Criminal), "Playback or Testimony" (approved April 16, 2012), is not convincing.  This argument is raised for the first time on appeal, and we review for plain error.

Although the court did not read the model charge after the forensic interview was replayed, it previously instructed the jury that they were to "arrive at a just conclusion after considering all of the evidence . . . presented" and it was their "duty to weigh the evidence calmly and without passion, prejudice or sympathy" in accordance with  Model Jury Charge (Criminal), "Criminal Final Charge."  We presume that the jury faithfully followed those instructions, State v. Nelson, 173 N.J. 417, 447 (2002) (citing State v. Manley, 54 N.J. 259, 271 (1969)), and do not discern any basis to find plain error.

VII.

Defendant's claim that the court improperly denied his motion to compel production of MCPO's standard operating procedures for interviewing child victims of sexual offenses lacks merit.  A trial court's ruling on a discovery issue "is entitled to substantial deference and will not be overturned absent an abuse of discretion."  State v. Stein, 225 N.J. 582, 593 (2016) (citing State v. Hernandez, 225 N.J. 451, 461 (2016)).  "Appellate courts 'generally defer to a

31

trial court's resolution of a discovery matter, provided its determination is not so wide of the mark or is not based on a mistaken understanding of the applicable law.'" State v. Szemple, 247 N.J. 82, 94 (2021) (quoting State in Int. of A.B., 219 N.J. 542, 554 (2014)).

"'While discovery in criminal cases is broad,' . . . 'it is not unlimited.'" State v. Desir, 245 N.J. 179, 194 (2021) (quoting Hernandez, 225 N.J. at 463). The discovery process is not "a fishing expedition." State v. Broom-Smith, 406 N.J. Super. 228, 239 (App. Div. 2009), aff'd, 201 N.J. 229 (2010).

Defendant filed his motion to compel discovery on July 9, 2023, three days before the trial began. He argued the information requested was "very important to the defense to have" to "effectively cross-examine Detective Infusino."

The court denied the motion noting that on May 17, 2023, defense counsel signed "a pretrial memorandum . . . indicating that pretrial discovery was complete, and that no motions were anticipated" and then "more than a month later" it received defendant's motion "three days prior to trial." The court found defendant did not "identify what coercive or suggestive techniques that he ha[d] a concern with." It concluded, "[d]iscovery ha[d] long been concluded" and "the probative value, based upon the argument made . . . , in reopening discovery on

this issue and adjourning the trial for that purpose [wa]s substantially outweighed by the risk of prejudic[e]." We are satisfied the court did not abuse its discretion by denying defendant's motion to compel.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

33